ZENITH RADIO CORPORATION,
Plaintiff,

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al., Defendants.

NATIONAL UNION ELECTRIC CORPORATION, Plaintiff,

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al., Defendants.

In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.

Civ. A. Nos. 74–2451, 74–3247.
MDL 189.

United States District Court,
E. D. Pennsylvania.

Aug. 7, 1980.

See also, D.C., 505 F.Supp. 1313; D.C., 505 F.Supp. 1190.

Blank, Rome, Comisky & McCauley, by Edwin P. Rome, William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for Zenith Radio Corporation and National Union Electric Corporation, plaintiffs.

Philip J. Curtis, John Borst, Jr., Glenview, Ill., for Zenith Radio Corporation, plaintiff.

Mudge, Rose, Guthrie & Alexander by Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Howard C. Crystal, Robert A. Jaffe, Shelly B. O'Neill, Mark K. Neville, Jr., New York City, Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., for Tokyo Shibaura Elec. Co., Ltd. and Toshiba America, Inc., defendants; defense coordinating counsel.

Duane, Morris & Heckscher by Henry T. Reath, Terry R. Broderick, Philadelphia, Pa., Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Arnold B. Calmann, Newark, N.J., Baker & McKenzie by Hoken S. Seki,

Thomas E. Johnson, Chicago, Ill., for Mitsubishi Electric Corporation.

Reid & Priest by Charles F. Schirmeister, Robert J. Lynch, New York City, L. Peter Farkas, Washington, D.C., for Mitsubishi Corporation and Mitsubishi International Corporation, defendants.

Weil, Gotshal & Manges by Ira M. Millstein, A. Paul Victor, Joel B. Harris, Kevin P. Hughes, Robert K. Hood, H. Adam Prussin, Jeffrey L. Kessler, Stuart Peim, Lenore Liberman, Gayle E. Hanlon, Alan Rothstein, Makoto Matsuo, New York City, Morgan, Lewis & Bockius by Raymond T. Cullen, Philadelphia, Pa., for Matsushita Elec. Indus. Co., Inc., Matsushita Elec. Corp. of America, Matsushita Electronics Corp., Matsushita Elec. Trading Co., and Quasar Electronics Corp., defendants.

Metzger, Shadyac & Schwarz by Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Stephen P. Murphy, William B. T. Mock, Jr.; Tanaka, Walders & Ritger by Lawrence R. Walders, B. Jenkins Middleton, Washington, D.C., Pepper, Hamilton & Scheetz by Robert Conrad, Philadelphia, Pa., for Hitachi, Ltd., Hitachi Sales Corporation of America, and Hitachi Kaden Hanbai Kabushiki Kaisha, defendants.

Wender, Murase & White by Peter J. Gartland, Gene Yukio Matsuo, Peter A. Dankin, Lance Gotthoffer, New York City, for Sharp Corporation and Sharp Electronics Corporation, defendants.

Whitman & Ransom by Patrick H. Sullivan, Dugald C. Brown, Kevin R. Keating, Michael S. Press, New York City, Pepper, Hamilton & Scheetz by Charles J. Bloom, Philadelphia, Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., and Sanyo Elec. Trading Co., Ltd., defendants.

Arnstein, Gluck, Weitzenfeld & Minow by Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Sears, Roebuck & Co., defendant.

Rosenman, Colin, Freund, Lewis & Cohen by Asa D. Sokolow, Renee J. Roberts, Marc Rowin, Kaye, Scholer, Fierman, Hays & Handler by Joshua F. Greenberg, New York City, Wolf, Block, Schorr & Solis-Cohen by Franklin Poul, Philadelphia, Pa., for Sony Corp. and Sony Corp. of America, defendants.

Kirkland & Ellis by Thomas P. Coffey, E. Houston Harsha, Karl F. Nygren, Chicago, Ill., for Motorola, Inc., defendant.

EDWARD R. BECKER, District Judge.

*OPINION* (Pretrial Order No. 283)

*(Admissibility of Public Records and Reports)*

CONTENTS

I. Preliminary Statement ........................................... 1136

II. Rule 803(8) – Its Scope and Its Requisites ........................... 1143
 A. Matters Admissible Under 803(8)(C) ........................... 1143
 B. The Trustworthiness Proviso ................................... 1146

III. The 1921 Antidumping Act Material ................................ 1150
 A. Introduction .................................................. 1150
 B. The 1921 Act Proceedings ..................................... 1151
 C. The Hearsay Objection – Are the Exceptions Satisfied ........... 1155
 1. Introduction .......................................... 1155
 2. The LTFV Findings .................................... 1155
 3. The Injury Finding .................................... 1157
 4. The Dumping Finding .................................. 1157
 5. The CF 29's ......................................... 1157
 D. The Relevancy Objections ..................................... 1158
 1. The LTFV Finding ..................................... 1158
 2. The Injury Finding .................................... 1160
 3. The Dumping Finding .................................. 1160

E. Exclusion of Evidence Under Rule 403 ........................ 1160
 1. Danger of Unfair Prejudice ............................ 1160
 2. Confusion of the Issues and Misleading the Jury ............. 1161
 3. Considerations of Undue Delay and Waste of Time .......... 1161
 4. Needless Presentation of Cumulative Evidence .............. 1161

IV. Findings Under the Trade Expansion Act of 1962 and the Trade Act of 1974 ......................................................... 1162
 A. Introduction; Overview of Trade Act Proceedings ............. 1162
 B. The Escape Clause Proceedings in Question .................... 1164
 C. The Trade Adjustment Assistance Proceedings ................. 1165
 D. Statistical Data ......................................... 1165
 E. The Hearsay Objection ................................... 1165
 1. Escape Clause Proceedings .......................... 1165
 a. Did the Commission Make 803(8)(C) Findings ........... 1165
 b. Trustworthiness ................................ 1166
 2. Trade Adjustment Assistance Proceedings ................. 1168
 a. Were 803(8)(C) Findings Made ..................... 1168
 b. Trustworthiness ................................ 1169
 F. The Relevancy Objection ................................. 1170
 1. The Escape Clause Proceedings ......................... 1170
 2. Trade Adjustment Assistance Proceedings .................. 1171
 G. Exclusion of Evidence Under Rule 403 ....................... 1172
 H. Miscellaneous Documents ................................. 1172

V. The Records and Findings of the Japanese Fair Trade Commission (JFTC) ......................................................... 1173
 A. Nature of the Proceedings before the JFTC .................... 1173
 B. The JFTC Documents at Issue .............................. 1176
 1. The Market Stabilization Case ......................... 1176
 2. The Matsushita Resale Price Maintenance Case .............. 1176
 C. The Evidentiary Contentions .............................. 1178
 1. Introduction ...................................... 1178
 2. The Hearsay Question: Admissibility Under 803(8)(C) ....... 1178
 a. Findings....................................... 1179
 b. Trustworthiness ................................ 1180
 3. F.R.E. 408, 410, and § 5(a) of the Clayton Act .............. 1181
 4. Other Relevancy Objections ........................... 1184

VI. Admissibility of Judge Higginbotham's Findings of Fact ............. 1184

VII. Materials from the Organization for Economic Cooperation and Development and the United Nations ................................... 1186
 A. Introduction ........................................... 1186
 B. Are the OECD and the United Nations Public Offices or Agencies Under 803(8) ............................................. 1187
 C. Trustworthiness ........................................ 1187

VIII. Conclusion .............................................1188

Appendix ......................................................1189

## I. Preliminary Statement

This is the first of several opinions that will address the myriad issues raised during the course of a lengthy pretrial evidentiary hearing in this antitrust case, the anatomy and scope of which have been described elsewhere.[1] The hearing, which commenced on June 16, 1980, and terminated on July 18, 1980, has had a two–fold purpose. First, it has enabled us to rule upon the admissibility of a number of documents that play a critical role in plaintiffs' case so that we will know whether to consider them in ruling upon defendants' motions for summary judgment, particularly their motions addressed to plaintiffs' conspiracy claims.[2]

1. *See* Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), *Zenith Radio Corp., et al. v. Matsushita Electric Industrial Co., Ltd. et al.*, 494 F.Supp. 1161 at 1164–67 (E.D. Pa. 1980.)

2. All defendants filed motions seeking summary judgment on one or more claims. Some are joint motions; others are motions by individual defendants, some of which are joined by other defendants; some motions are addressed to discrete legal issues; others are omnibus motions addressed to several issues. We have already (1) denied a motion seeking summary judgment for lack of subject matter jurisdiction, *see* note 1, *supra*; (2) granted in major part defendants' motion for summary judgment on those claims arising under § 801 of the Revenue Act of 1916, better known as the 1916 Antidumping Act, 15 U.S.C. § 72, *see* Opinion and Order (1916 Antidumping Act), *Zenith Radio Corp., et al. v. Matsushita Electric Industrial Co., Ltd., et al.*, 494 F.Supp. 1190 (E.D. Pa. 1980); (3) denied a motion for summary judgment brought by certain defendants against plaintiff Zenith Radio Corp. on the ground that Zenith was not directly injured and was therefore barred from recovery under the doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), *see* Opinion and Order (Indirect Injury–*Illinois Brick*), *Zenith Radio Corp., et al. v. Matsushita Electric Industrial Co., Ltd., et al.*, 494 F.Supp. 1246 (E.D. Pa. 1980); (4) denied a motion asserting that plaintiff National Union Electric Corp. lacked standing to sue under the doctrine of *Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), *see* Opinion and Order (Antitrust Standing–*Bangor Punta*), *National Union Electric Corp. v. Matsushita Electric Industrial Co., Ltd., et al.*, 498 F.Supp. 991, (1980); (5) denied a motion by defendant Sears, Roebuck & Co. for summary judgment based on statute of limitations grounds, *see* Pretrial Order 263, *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd., et al.*, M.D.L. No. 189 (May 23, 1980); and (6) denied a motion by Sharp Electronics Corp. claiming that Zenith's claims under the 1916 Antidumping Act are barred by the Treaty of Friendship, Commerce and Navigation between the United States and Japan, 4 U.S.T. 2063, T.I.A.S. No. 2863 (1953), *see* Memorandum and Order, (1953 Treaty of Friendship, Commerce and Navigation with Japan), *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd., et al.*, 494 F.Supp. 1263 (E.D. Pa. 1980). A motion asserting insufficiency of evidence of the monopolization and attempted monopolization claims against individual defendants under § 2 of the Sherman Act (the so-called "individual monopolization claims") has in major part dissolved, although some of the same arguments will be reasserted in connection with defendants' omnibus conspiracy motion, to the extent that they relate to collective Sherman Act § 2 violations. An individual motion by Sony Corporation advancing its allegedly unique position as a high price, rather than a low price, seller of television sets has, following argument, been deferred to be considered with the other conspiracy motions, on the ground that there is too much overlap among defendants to make separate consideration for Sony feasible. We have heard argument on a motion asserting insufficiency of the evidence of price discrimination under the Robinson–Patman Act and on motions addressed to the claims under § 7 of the Clayton Act, and intend to dispose of those motions shortly. Finally, later this month we shall hear argument on defendants' series of motions addressed to plaintiffs' conspiracy claims, which allege, *inter alia* :

(a) that there is a lack of evidence of conspiracy;

(b) that the evidence of consciously interdependent parallel behavior, required to prove conspiracy, is insufficient;

(c) that the "check–price agreements," which plaintiffs contend are central to defendants' conspiracy, were mandated by the Japanese Ministry of International Trade and Industry (MITI) and hence cannot be condemned by the United States antitrust laws under the act of state and sovereign compulsion doctrines, and principles of international comity; and,

Second, the hearings were *in limine*, and have provided the forum for a pretrial ruling on the question whether plaintiffs have come forward with a fair preponderance of independent evidence ("evidence *aliunde*") of the existence of a conspiracy among the various defendants to enable them to proceed with their conspiracy claims. *See United States v. Bey*, 437 F.2d 188 (3rd Cir. 1971) and its progeny, cited in *United States v. Continental Group, Inc.*, 603 F.2d 444 (3rd Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).

As we commenced these hearings, we realized that both of these undertakings, which for the most part overlap, were formidable. As appears from plaintiffs' 17,000 page final pretrial statement (FPS),[3] plaintiffs' case is erected primarily upon documents. Both the FPS and the list of evidence *aliunde* which plaintiffs have filed pursuant to Pretrial Order No. 154, as refined by Pretrial Order Nos. 222, 227, and 232, list approximately 250,000 documents, the originals of many of which are in Japanese.[4] Obviously, no one could read 250,000 documents within a reasonable time, even if all the Japanese language documents had been translated into English, which they have not.

(d) that in order to prove predatory intent for purposes of their claims of monopolization, dumping, and Robinson–Patman violations, plaintiffs must advance evidence of pricing below marginal cost, or its surrogate average variable cost (the standard advanced by Professors Areeda and Turner) and that failure to come forth with such evidence requires the grant of summary judgment on such claims.

3. Pretrial Order 154, reprinted at 478 F.Supp. 946, 949–50 (E.D.Pa.1979), required plaintiffs to set forth in their Final Pretrial Statement, with preclusionary effect, every fact "including subsidiary and supporting facts, that they intend to prove at trial, keyed to specific witnesses, documents, and depositions, together with a specific enumeration by the plaintiffs of the facts (evidence *aliunde*) by which they intend to prove each defendant's complicity in the alleged conspiracy." As noted in our opinion on subject matter jurisdiction, *see* n.1, *supra*, the final pretrial statements were also intended to act in large part as surrogates for incomplete discovery.

Even prior to the commencement of the hearings, however, and with the concurrence of counsel for the plaintiffs and defendants, we concluded that a reading of only a small portion of these documents was necessary. A substantial number are transactional or other documents which are of the same or similar form or genre; hence, a sample is sufficient for consideration and omnibus ruling. Many of the documents are in the nature of general background material. Many of the documents relate to the issue of damages, which is not now before us. And many of the documents are, for other reasons, unrelated or of peripheral relevance to either the summary judgment motions or the *in limine* conspiracy determination. As we imperfectly, though correctly, perceived prior to the hearings, and as is now eminently clear in the wake thereof, notwithstanding the avalanche of paper under which this case has become buried over the course of a decade, there are a not insubstantial but discrete number of critically important documents that are central to the case and upon which, in not inconsiderable measure, it must stand or fall. These are the documents upon which we have focused during these hearings.

The important documents fall into a number of broad categories as follows:

4. No one has counted the number of documents listed, and 250,000 (apparently 250,000 document pages) is only an estimate. Some 100,000 pages of documents are filed in the central document depository, located in our jury room. Certain defendants have moved to strike plaintiffs' list of evidence *aliunde* on the ground that it flouts the spirit, if not the letter, of our requirement that plaintiffs set forth a list of the documents upon which they rely as evidence linking each defendant to the conspiracy alleged. In defendants' view plaintiffs' list is useless in that it is essentially a summary of plaintiffs' entire Final Pretrial Statement, incorporating "hundreds of thousands" of documents, which are not described in any way and are identified only by number. We have not yet ruled on defendants' motion to strike. It may well be mooted by the *modus procedendi* followed in connection with the evidentiary hearings.

1. Documents, including certain findings, promulgated by the U.S. Treasury Department and U.S. Tariff Commission in connection with proceedings under the 1921 Antidumping Act.

2. Documents, including certain findings, promulgated by the U.S. Tariff Commission and its successor, the U.S. International Trade Commission (I.T.C.) as well as the Secretary of Labor under §§ 301(b)(1) and (c)(1) and (2) of the Trade Expansion Act of 1962 and §§ 201(b) and 221 of the Trade Act of 1974.

3. Certain purported findings and related documents of the Japanese Fair Trade Commission (JFTC) arising out of proceedings in two cases before the JFTC, one, in 1957, brought against the Home Electric Appliance Market Stabilization Council, some of whose members are defendants in this action,[5] alleging industry-wide price-fixing, and the second, brought in 1967, alleging retail price maintenance against defendant Matsushita Electric Industries Co., Ltd.

4. The findings of Judge A. Leon Higginbotham, Jr., our predecessor in this case, regarding personal jurisdiction and venue, found at 402 F.Supp. 262 (1975).[6]

5. Statistical data from the statistical office of the United Nations and a report of the Organization for Economic Cooperation and Development.

6. Diaries of officials of several of the Japanese defendants, alleged to contain evidence of the conspiracy referenced in plaintiffs' complaint, which were seized in 1966 and utilized in the course of JFTC Case No. 6 of 1966 (the so-called "Six Company Case"). That case was an investigation and proceedings against six of the defendants, Sanyo Electric Corp., Tokyo Shibaura Electric Corp. (Toshiba), Hayakawa Electrical Industry Corp. (now Sharp Corporation), Hitachi Industry Corp., Matsushita Electric Industry Corp. (MEI), and Mitsubishi Electric Corp. (MELCO). The six companies were charged with a conspiracy to fix prices and to engage in a variety of activities in violation of the Japanese Anti–Monopoly Law. The eight diaries in dispute have been attributed to a Mr. Yajima, an employee of Toshiba (3 diaries); Messrs. Yamamoto (2 diaries) and Yamada, both employees of Hitachi; a Mr. Okuma, an employee of MELCO; and Mr. Tokizane, an employee of MEI. Also included in this category are a number of internal company memoranda also seized by the JFTC.

7. Transcripts of testimony and of protocols by witnesses in the Six–Company case. A protocol is a written statement outlining the substance of oral discussions between a JFTC staff member and a witness, which the witness signs to indicate that the contents comport with his statement.

8. Various agreements and rules of certain Japanese manufacturers' associations relating to export practices.

9. Various documents alleged to be minutes or memoranda of meetings of committees of certain manufacturers' associations.

10. A purported internal memorandum of the Japan Victor Company, 51% of which is owned by MEI, allegedly reflecting the decision made by the Electronic Industries Association of Japan (EIAJ) to conceal from the Japanese Ministry of International Trade and Industry (MITI) the discrepancy between domestic and export prices and suggesting changes in accounting methods by which such concealment could be accomplished.

11. Various memoranda, letters, telexes, and transactional documents produced by the defendants in discovery and involving

---

5. Parties to this action who were also members of the Market Stabilization Council are Matsushita Electric Industrial Co., Ltd., Hitachi, Ltd., Mitsubishi Electric Corp. and Sanyo Electric Co., Ltd. Toshiba Shoji Co., Ltd., a non–party subsidiary of defendant, Tokyo Shibaura Electric Co., Ltd. was also a member.

6. The "judicial history" of this case, *i. e.*, the sequence of assigned judges, is explained in Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), *Zenith Radio Corp. et al. v. Matsushita Electric Industrial Co., Ltd., et al.*, 494 F.Supp. 1161, 1164 n. 5 (E.D. Pa. 1980).

the Japanese manufacturers, their trading companies, their American sales subsidiaries and various U.S. customers, which, in plaintiffs' submission, show a pattern of "under the table" or concealed rebates that reduced the price of Japanese TVs to American customers below the so–called check price that was reported to U.S. Customs, and which also reveal a "cover–up" of what plaintiffs describe as a predatory export scheme.

12. A potpourri of other documents, produced for the most part from defendants' files during discovery.

13. Voluminous reports setting forth the opinions (with supporting data) of plaintiffs' experts.

This opinion will consider the admissibility of the matters set forth in the first five categories enumerated above. We took these matters up together in the hearings and decide them together because all involve, or are alleged to involve, the admissibility of public records and reports under Rule 803(8) of the Federal Rules of Evidence (F.R.E.). Consistent, however, with the *modus procedendi* of the evidentiary hearings, we shall consider all provisions of the F.R.E. bearing upon admissibility of a given piece of evidence, including those dealing with relevancy. The rulings which we announce herein relate to plaintiffs' claims against the defendants. We do not discuss and do not purport to decide whether all or any of these documents may be used by plaintiffs or by defendants in connection with defendants' counterclaims, since it is conceivable that some of these documents may be offered for a nonhearsay purpose to establish facts relevant to these counterclaims and the defense thereof.

Before proceeding further, it is important to say a word or two about the appropriateness of the course of pretrial evidentiary determination we are following.

■ The Manual for Complex Litigation, in § 1.80, counsels the early resolution of preliminary legal questions. As outlined at p. 1136, *supra*, we view these hearings against the background of two primary, overriding, and overlapping preliminary de-

terminations. First, we must assess whether plaintiffs have met their burden of coming forth with sufficient evidence *aliunde* of the existence of a conspiracy among the various defendants to enable them to go forward with their conspiracy claims. *See United States v. Continental Group, Inc.,* 603 F.2d 444 (3rd Cir. 1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Additionally, we must rule on defendants' outstanding motions for summary judgment, and it is indisputable that a Rule 56 determination must be made upon admissible evidence. *See* Rule 56(e).

■ In determining admissibility under Rule 56, the same standards apply as at trial. *See Munoz v. International Alliance of Theatrical Stage Employees,* 563 F.2d 205, 207 n. 1 (5th Cir. 1977); *608 Hamilton Street Corp. v. Columbia Pictures Corp.,* 244 F.Supp. 193, 195 (E.D.Pa.1965). Thus, in ruling upon summary judgment motions, courts refuse to consider hearsay (*Daily Press, Inc. v. UPI,* 412 F.2d 126, 133 (6th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Trist v. First Federal Savings and Loan Association,* 466 F.Supp. 578, 588–89 n. 15 (E.D.Pa.1979) (Lord, Ch. J.)); unauthenticated documents (*California Pacific Bank v. Small Business Admin.,* 557 F.2d 218, 222 (9th Cir. 1977); *United States v. Dibble,* 429 F.2d 598 (9th Cir. 1970)); inadmissible expert testimony (*Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 671–74 (D.C.Cir.1977); *Herbert v. Lando,* Civ. No. 74–434 (CSH) (S.D.N.Y. March 19, 1980)); documents without a proper foundation (*Hamilton v. Keystone Tankship Corp.,* 539 F.2d 684, 686 (9th Cir. 1976)); parol evidence (*Starling v. Valmac Industries Inc.,* 589 F.2d 382 (8th Cir. 1979)), and even evidence barred by the dead man's rule (*Super Valu Stores Inc. v. First National Bank,* 463 F.Supp. 1183, 1192–93 (M.D.Ga.1979)).

In order to act upon the outstanding summary judgment motions, we must therefore assess the admissibility of disputed items of evidence. To do so in an *in limine* proceeding will greatly expedite the trial and will avoid duplicative argument. Such a pro-

ceeding comports with § 4.22 of the Manual for Complex Litigation, which suggests that the court make pretrial rulings on objections to documentary evidence. Wright & Graham set forth a list of factors bearing upon the use of *in limine* rulings in particular cases. *See* 21 Wright & Graham, *Federal Practice and Procedure,* § 5037 at 193–95. The factors favoring such rulings include increasing trial efficiency and promoting improved accuracy of evidentiary determinations by virtue of the more thorough briefing and argument of the issues that are possible prior to the crush of trial. To these salient factors we add the utility of *in limine* rulings in connection with summary *judgment motions.* Countervailing factors include inadequacy of the record prior to trial, the possibility that the issue may not arise at trial, and the burdensomeness of *in limine* proceedings.

As will be seen as we proceed through the materials before us, the evidentiary issues in this case are complex. Detailed briefing and argument have been essential, as can be seen from the fact that even after argument, we found it necessary to request supplemental briefing on over twenty issues that arose during colloquy. To devote the kind of attention to these matters that they require during, rather than before, trial, would create delays that would be terribly unfair to the jury. Furthermore, because many of the categories of items offered for rulings during these pretrial hearings comprise major chunks of plaintiffs' case, a pretrial ruling will permit counsel for both sides to make efficient use of their trial preparation time by narrowing the issues, and, to the extent that they may to some degree be outcome determinative, permit interlocutory review which might save many months of trial otherwise conducted in error.

Of the inhibiting factors, none apply to this case. Our record is not inadequate, for we consider the summary judgment motions based upon an extensive record as set forth in plaintiffs' preclusive final pretrial statement, *see* n. 3, *supra.* Because the documents under consideration are the critically important ones, they would certainly

be offered for our consideration at trial. As to the burdensomeness of these proceedings, we need only note that the issues must be faced sometime, and now, before a jury is empanelled, strikes us as better than later.

In the course of describing this litigation, we have had occasion to observe that it spans the law of antitrust. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 478 F.Supp. 889, 893 (1979), *vacated and remanded,* 631 F.2d 1069 (3rd Cir., 1980). It is appropriate at this juncture to observe that the issues raised in the evidentiary hearings span the law of evidence, or at least the Federal Rules of Evidence (F.R.E.) and pose a number of questions which are apparently of first impression under those rules. Of critical importance, and often of not inconsiderable difficulty, are problems arising under the following Rules: 104 (Preliminary Questions of Admissibility); 401 (Relevant Evidence); 403 (Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Waste of Time); 410 (Inadmissibility of Pleas, Offers of Pleas and Related Statements); 602 (Lack of Personal Knowledge); 605 (Competency of Judge as Witness); 702 (Testimony by Experts); 703 (Bases of Opinion Testimony By Experts); 704 (Opinion on Ultimate Issue); 705 (Disclosure of Facts or Data Underlying Expert Opinion); 801(d)(2) (Admission by Party–Opponent); 803(5) (Recorded Recollection); 803(6) (Records of Regularly Conducted Activity); 803(8) (Public Records and Reports); 803(24) and 804(b)(5) (The Residual Hearsay Exceptions); 804(b)(1) (Former Testimony); 804(b)(3) (Statement Against Interest); 805 (Hearsay Within Hearsay); 806 (Attaching and Supporting Credibility of the Claimant); 901 (Authentication); 902 (Self Authentication); 1003 (Admissibility of Duplicates); and 1005 (Public Records). Also implicated are the general constructional rule (Rule 102) and the relationship of many of the Rules inter se; *e. g.,* Rules 104 and 901; Rules 104 and 803(6); Rules 703 and 803(8).

Because Rule 403 assumed a prominent role in many facets of our hearings and because of its potential scope, we think it useful to comment at the outset on the appropriateness of making Rule 403 determinations at a pretrial hearing.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Although there appear to be no cases discussing the applicability of Rule 403 to motions for summary judgment, there are many cases in which pretrial rulings have been made under Rule 403. *See Thomas v. C. G. Tate Construction Co.*, 465 F.Supp. 566 (D.S.C.1979) (motion *in limine* by defendant to prohibit personal injury plaintiff from offering films of himself into evidence); *Depew v. Hanover Insurance Co.*, 438 F.Supp. 358, 360 (E.D.Tenn.1977) (motion *in limine* to prohibit defendants from offering testimony regarding deceased's statements implicating plaintiff in alleged arson); *Grimes v. Employers Mutual Liability Insurance Co. of Wisconsin*, 73 F.R.D. 607, 610 (D.Alaska 1977) (motion *in limine* in personal injury action to determine admissibility of films of plaintiff); *United States v. Jackson*, 405 F.Supp. 938, 943–45 (E.D.N.Y.1975) (motion *in limine* by defendant to exclude evidence of presence in another jurisdiction and use of a false name); *Apicella v. McNeil Laboratories*, 66 F.R.D. 78, 86 (E.D.N.Y.1975) (motion *in limine* to preclude parties from using medical newsletter at trial in action against drug manufacturer). *See also United States v. Bocra*, 623 F.2d 281 at 284 (3rd Cir. 1980) (affirming grant of motion *in limine* to preclude defendant from mentioning other bribe cases involving I.R.S. agent); *United States v. Nu–Phonics, Inc.*, 433 F.Supp. 1006, 1014 (E.D.Mich.1977) (establishing rule that economic evidence would be excluded in antitrust conspiracy prosecution if it were too distant in time from duration of alleged conspiracy).

Because pretrial rulings expedite the trial and eliminate surprise, *in limine* rulings on objections under Rule 403 are favored by the commentators. *See* Manual for Complex Litigation, § 4.22; 22 Wright & Graham, *Federal Practice and Procedure: Evidence*, § 5224 at p. 320–21 (1978) (Wright and Graham); Saltzburg & Redden, *Federal Rules of Evidence Manual* (2d ed. 1977) at 116. In their discussion of Rule 403, Wright and Graham state that:

> Courts and commentators generally agree that any inquiry into preliminary facts in an invocation of discretionary exclusion should be heard out of the earshot of the jury. This suggests the desirability of a pretrial hearing where the issue is important and complex. The use of the motion *in limine* for this purpose should be encouraged.

Accordingly, when objections have been made to otherwise admissible evidence based upon factors enumerated in Rule 403, we have considered them and include our 403 determinations in these evidentiary opinions.

By way of preliminary "across the board" discussion, we also address two principles that plaintiffs ask us to apply generally to all of the evidentiary questions before us. First, they read in F.R.E. 102 ("These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that truth may be ascertained and proceedings justly determined") a charter of liberality in the admission of evidence and a presumption that would require us, where the question is close, to err on the side of admissibility. We do not so read Rule 102. While we agree that the Rules are designed to be flexible, we do not see that flexibility as favoring admission where specific requirements set forth in particular rules are not met. To read Rule 102 as giving the court unbridled discretion would essentially render the individual rules meaningless. In this regard we endorse the comments of Saltzburg and Redden in *Federal Rules of Evidence Manual* (2d ed. 1977) at 14:

When Rule 102 states that the Federal Rule shall be construed to the end that the truth may be ascertained and proceedings justly determined, does this signify that whenever the Judge is doubtful as to whether evidence should be admitted or excluded, he should err on the side of admission in order to aid the search for truth?

The answer must be NO for several reasons. First, the Fourth Article of the new Federal Rules makes it clear that certain evidence must be excluded even though it is relevant, because it is too prejudicial or possibly too confusing. In such instances, the search for truth would not be aided by admitting this evidence. When the Trial Judge has doubts about the admissibility of evidence, he must always remember to balance the possible prejudicial effect of evidence against its probative value. Only then can he be sure that the search for truth is aided by his ruling. Second, the Rules also recognize that there are other policies served by rules of evidence aside from reaching accurate decisions as to what happened in a particular case. In dealing with offers to compromise, evidence of insurance, subsequent remedial measures, and privileges, for example, the Trial Judge must consider factors other than accurate reconstruction of historical facts. Finally, Rule 102 itself notes that the Rules must be construed to eliminate unjustifiable expense and delay. In short, there are other factors to be weighed against the probative value of evidence.

Professors Saltzburg and Redden's observation about delay is especially pertinent in the context of this case, which we have estimated will take at least a year to try.

■ Second, plaintiffs place great reliance on certain statements of Judge Forman in *United States v. General Electric Co.*, 82 F.Supp. 753, 903 (D.N.J.1949); "Broad discretion and great latitude are permitted in the reception of evidence in conspiracy cases... Exaggerated and over–refined niceties in the rules of evidence must give way to the broad terms of Rule 43(a), Federal Rules of Civil Procedure, if full effect of the anti–trust laws is to be given." *Accord, United States v. E. I. DuPont de Nemours and Co.*, 10 F.R.D. 618, 621 (D.Del.1950) (Leahy, J.). Plaintiffs thus advance the principle that more liberal evidentiary rules apply in antitrust cases. In response, we note only that these opinions preceded the Federal Rules of Evidence by many years and that we have found nothing in the Rules themselves to indicate that they are to be applied less (or more) stringently in antitrust cases than in any other kind of lawsuit.

Our pretrial evidentiary hearings have consisted mostly of legal argument and colloquy, although on some points testimony has been taken. Numerous and lengthy supporting briefs and affidavits have been filed. Each piece of evidence to be considered has been accompanied by what we have termed a Document Submission Sheet (DSS). The DSS was prepared in three stages: the proponent of the evidence prepared Part I, identifying the document, referencing it to the FPS and enclosing it within a folder (both Japanese original and English translation, in cases of Japanese language documents). The party opposing admission completed Part II, setting forth the grounds of objection, and the proponent then completed Part III, stating its rejoinder. A copy of the DSS is attached as an exhibit to this opinion.

The hearings were grueling. They consumed almost five weeks, with most sessions running into the early evening (and one running well past midnight). Notwithstanding the length of the hearings, we were unable to cover all of plaintiffs' critical documents but will consider them on the basis of detailed post-hearing submissions and supplemental memoranda.

We turn first to a discussion of the basic principles of Rule 803(8), with particular emphasis on 803(8)(C), to be followed by an application of these principles (and those of Article IV of the F.R.E.–Relevancy and Its Limits) to the specific documents at issue here.

## II. Rule 803(8)–Its Scope and its Requisites

### A. Matters Admissible Under 803(8)(C)

Rule 803(8) creates an exception to the hearsay rule for:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The first two elements of the Rule, sections (A) and (B), are relatively simple and, at least as applied to civil actions, are essentially self–explanatory. They represent a codification of generally accepted evidentiary principles, and we shall not dwell upon them herein.[7] Section (C), on the other hand, is quite complex, and represents a major change from common law principles.[8] For, quite contrary to what was generally permitted at common law, under the aegis of 803(8)(C), materials representing the distillation of a process that may have involved years of investigation and the taking of thousands of pages of testimony may be presented to the trier of fact in one fell swoop.

A graphic example may be found in *In Re Plywood Antitrust Litigation*, 1979–1 Trade Cases ¶ 62,459 (E.D.La.1978) in which three manufacturers of softwood plywood were alleged by a class of purchasers to have conspired in violation of the Sherman Act to fix and maintain a system of delivered prices. The private antitrust case followed on the heels of a lengthy Federal Trade Commission (FTC) proceeding under § 5a of the FTC Act, which had involved the same facts. Judge Pointer, relying on 803(8)(C), admitted into evidence in the antitrust trial findings of an FTC Administrative Law Judge and lengthy excerpts from the FTC's opinion.

The language of 803(8)(C) literally provides for the admission of entire agency reports so long as those reports include, *inter alia*, factual findings ("reports ... setting forth ... factual findings ..."). It is clear, however, that the intent of the drafters was to permit admission of a somewhat narrower class of materials, *i. e.*, factual findings set forth in reports. The question thus becomes what constitutes a factual finding, a question that is not free from difficulty given the general willingness of the courts to admit as 803(8)(C) material the so–called evaluative report, which often contains, in addition to findings, a large amount of material that is not independently admissible.[9] *See* discussion *infra.*

**7.** One point that has arisen with respect to 803(8)(B) is whether it or Rule 803(6) is applicable to what might be considered a business record prepared by a public official. The weight of authority seems to be that 803(8)(B) applies, *see United States v. Orozco*, 590 F.2d 789 (9th Cir.), *cert. denied*, 439 U.S. 1049, 99 S.Ct. 728, 58 L.Ed.2d 709 (1979); *United States v. Oates*, 560 F.2d 45 (2nd Cir. 1977); *United States v. Smith*, 521 F.2d 957 (D.C.Cir.1975). *Cf. Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979) (803(8)(B), rather than 803(5) (Recorded Recollection), applied to police report). We agree with these decisions and do not apply 803(6) to the public records and reports at issue herein.

**8.** Judge Rubin in *Fraley v. Rockwell Int'l Corp.*, 470 F.Supp. 1264, 1266 (S.D.Ohio 1979) termed 803(8)(C) "one of the most controversial exceptions to the hearsay rule."

**9.** The Advisory Committee Note accompanying 803(8)(C) makes clear the intent of the drafters to permit admission of the evaluative report. The House Committee on the Judiciary, however, adopted a narrow interpretation of the term "factual findings":

The Committee intends that the phrase "factual findings" be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this Rule.

Report of the Committee on the Judiciary, H.R. Rep.No. 93–650, 93d Cong., 1st Sess. 14 (1973),

■ Black defines a finding variously as "the result of deliberations of a jury or the court; a decision upon a question of fact reached as the result of a judicial examination or investigation; a determination from the evidence of a case; a conclusion by way of reasonable inference from the evidence." These definitions comport with the common sense meaning of "finding" and support the view that a finding does not include legal conclusions that may have been reached by an investigator [10] and is necessarily something more than a mere recitation of evidence, although we think the term is broad enough to encompass any statement of fact that represents a conclusion on the part of an investigator and that such factual statements need not be formally termed "findings" in order to come in under 803(8)(C).[11]

This conclusion accords with the case law, which has applied 803(8)(C) to a variety of materials. *See, e.g., Melville v. American Home Assurance Co.*, 443 F.Supp. 1064 (E.D.Pa.1977), *rev'd on other grounds*, 584 F.2d 1306 (3rd Cir. 1978) (admitting Federal Aviation Administration Airworthiness Directives); *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179 (3rd Cir.), *cert. denied*, 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978) (factual findings of hearing examiner in Coast Guard proceeding admissible); *Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979) (police report containing findings about color of traffic light at the time of accident admissible); *Sage v. Rockwell Int'l Corp.*, 477 F.Supp. 1205 (D.N.H.1979) (reports discussing general circumstances of an airplane crash and conclusions about the cause of the crash admissible); *Fraley v. Rockwell Int'l Corp.*, 470 F.Supp. 1264 (S.D.Ohio 1979) (related case to *Sage, supra,* admitting report containing conclusions about the cause of the crash, but excluding report discussing general circumstances on the ground that it was prepared by an inexperienced investigator and was therefore not trustworthy); *United States v. School Dist. of Ferndale*, 577 F.2d 1339 (6th Cir. 1978) (findings of HEW hearing examiner admissible).

■ Although it was not entirely clear until the caselaw began to develop, it is now generally accepted (and settled in

1974 U.S.Code Cong. & Admin.News pp. 7051, 7088.

The Senate rejected this construction:

The House Judiciary Committee report contained a statement of intent that "the phrase 'factual findings' in subdivision (C) be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this rule." The committee takes strong exception to this limiting understanding of the application of the rule. We do not think it reflects an understanding of the intended operation of the rule as explained in the Advisory Committee notes to this subsection. The Advisory Committee notes on subsection (C) of this subdivision point out that various kinds of evaluative reports are now admissible under Federal statutes. 7 U.S.C. § 78, findings of Secretary of Agriculture prima facie evidence of true grade of grain; 42 U.S.C. § 269(b) bill of health by appropriate official prima facie evidence of vessel's sanitary history and condition and compliance with regulations. These statutory exceptions to the hearsay rule are preserved. Rule 802. The willingness of Congress to recognize these and other such evaluative reports provides a helpful guide in determining the kind of reports which are intended to be admissible under this rule.

We think the restrictive interpretation of the House overlooks the fact that while the Advisory Committee assumes admissibility in the first instance of evaluative reports, they are not admissible if, as the rule states, "the sources of information or other circumstances indicate lack of trustworthiness."

Report of the Committee on the Judiciary, S.Rep.No. 93–1277, 93d Cong., 2d Sess. 18 (1974), U.S.Code Cong. & Admin.News 1974, p. 7064.

The Conference Committee did not resolve this difference in interpretation, but as discussed *infra*, it is apparent that the courts have generally taken the more liberal view expressed by both the Advisory Committee and the Senate.

10. Arguably, neither does the term "findings" encompass investigations stated in documents that are accusatory or prosecutorial in nature, although we conclude *infra* that such matters are more properly considered under the "trustworthiness" proviso of 803(8).

11. Obviously, 803(8)(C) also encompasses the findings of public offices or agencies of state and foreign governments. See *Weinstein's Evidence*, § 803(8)[01] at 803-190. *Cf. Lloyd v. American Export Lines, Inc., supra,* 580 F.2d at 1189.

this circuit) that under the aegis of 803(8)(C) evaluative reports of public agencies (i. e., those rendering normative judgments or opinions, not just reciting facts) are admissible. *See Melville v. American Home Assurance Co., supra,* 443 F.Supp. 1064.[12] The caselaw has yet to make clear, however, whether the conclusion that evaluative reports come within the definition of 803(8)(C) findings renders admissible all materials within those reports—even those that do not fall within our definition of "finding," including hearsay materials that are not otherwise admissible. This is a critical question, for as will be seen, the staff workups upon which plaintiffs here rely contain, in many instances, multiple hearsay and broad ranging and highly conclusory statements.

Although the fact is not reflected in the published opinion, the record of the *Plywood* litigation, *supra,* shows that Judge Pointer admitted as findings only factual statements and excluded those that contained legal conclusions. Furthermore, he only admitted those findings of the administrative law judge that were approved and adopted in the opinion of the F.T.C.[13] We agree with the approach taken by Judge Pointer. We conclude that so long as the trustworthiness criteria are met (*see* discussion *infra*), where a staff report contains factual averments that are not mere recitations of evidence, but rather reflect conclusions made by the staff on the basis of evidence before it, those averments may be admitted as 803(8)(C) "findings." Where, however, the staff report is submitted to a commission or other public agency charged with making formal findings, only those factual statements from the staff reports that are approved and adopted by the agency will qualify as 803(8)(C) "findings."

▉▉▉ Furthermore, we do not believe that the drafters envisioned that 803(8)(C) would result in the admission of all the exhibits and data that might accompany a given staff report. As we see it, the drafters of 803(8)(C) were motivated by a variation on the theme underlying all hearsay exceptions—that circumstantial guarantees of trustworthiness are provided by the presumption that governmental officials will perform their duties faithfully. Accordingly they were agreeable to the receipt into evidence of governmental agency findings. We do not perceive, however, that the drafters intended to piggyback the whole administrative proceeding on top of the trial. To do so would permit vast amounts of time to be spent addressing the admissibility of exhibits which are but excess baggage with no direct bearing on the issues at trial. Such a result would, indeed, offend the basic constructional rule, F.R.E. 102, one of whose precepts is the "elimination of unjustifiable expense and delay," as well as the principles underlying Rule 403. *See John McShain, Inc. v. Cessna Aircraft Co.,* 563 F.2d 632 (3rd Cir. 1977). This point will come clearer as we proceed through our analysis of the evidence.

Conceptually, we believe this result is consistent with the principles of F.R.E. 703, under which an expert's opinion, based in part on inadmissible evidence, is admissible even though the underlying data is not admissible for its truth. We sense a reluctance on the part of the courts to permit the underlying data unless it is independently admissible. *See, e. g., Baker v. Elcona Homes, supra,* 588 F.2d at 559 (6th Cir. 1978). *But see Complaint of American Export Lines, Inc.,* 73 F.R.D. 454 (S.D.N.Y. 1977), in which Judge Tenney admitted not only the factual findings made pursuant to a prior proceeding of the United States Coast Guard but the exhibits that accompanied the Coast Guard record and report as well. Judge Tenney's decision as to the exhibits consumes but one brief paragraph of his opinion, and we do not feel bound by

---

12. *Melville* has been followed in other jurisdictions. *See Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir. 1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); *Sage v. Rockwell Int'l Corp.,* 477 F.Supp. 1205 (D.N. H.1979).

13. We have reviewed extensive portions of the record in *Plywood* and have, by discussion with Judge Pointer, verified the scope of his rulings.

it. Instead, we adhere to the view that, unless independently admissible, the exhibits do not come along as "excess baggage." We agree, however, with Judge Tenney's decision that transcripts of agency hearings are not admissible under 803(8)(C), but are tested instead under the provisions of Rule 804(b)(1) (Former Testimony).[14]

With these general observations as to the scope of 803(8)(C) findings in mind, we turn to a discussion of the "trustworthiness" proviso of 803(8) under which those findings must be tested.

### B. *The Trustworthiness Proviso*

■■■■■ The text of Rule 803(8)(C), *supra*, and the Advisory Committee note, *see infra*, make plain that broad leeway is accorded to the trial judge to exclude 803(8) material where the sources of information and other circumstances indicate lack of trustworthiness. Because 803(8)(C) is such a potent litigation tool, the parties are prone to skirmish mightily over the trustworthiness *vel non* of public records and reports. The Advisory Committee makes clear that opponents of the evidence have the burden of rebutting the presumption that 803(8)(C) materials are trustworthy and admissible. "[T]he rule ... assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." Advisory Committee Note to Rule 803(8). *See Melville v. American Home Assurance Co., supra*, 443 F.Supp. at 1112.

■■■■■ The trustworthiness question is something which, as we see it, must be resolved prior to trial, lest there be lengthy delays in the midst of the trial process (most disconcerting to the jury) while the court adjudicates the matter; accordingly, the *in limine* or pretrial hearing is the appropriate vehicle for such adjudication, which can take the form of admission or exclusion of evidence or redaction thereof. Although Rule 803(8) requires the court to make a threshold determination on the trustworthiness issue, the Rule also clearly implies that where the court determines that the evidence passes that threshold, the party against whom the evidence is offered may counter it by introducing before the jury evidence of the untrustworthiness of the public record or report.[15] However, where the probative value of the report is outweighed by the danger of unfair prejudice, confusion of issues, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence attendant upon the opponents' efforts to establish untrustworthiness of the report, the court may exclude the report under F.R.E. 403. *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632 (3rd Cir. 1977).

■■■■ The Advisory Committee addressed the important question of the criteria to be applied in determining trustworthiness of evaluative reports, listing the following factors for assistance in passing upon admissibility:

(1) the timeliness of the investigation ...; (2) the special skill or experience of the official ...; (3) whether a hearing was held and the level at which conducted ...; (4) possible motivation problems ....

Advisory Committee note to 803(8) (citations omitted). The Committee also observed: "Others no doubt could be added." As we proceeded through our hearings on public records and reports, it became clear to us that this statement was correct, or perhaps prescient.

Consonant with the Advisory Committee's thought, and in aid of disposition of

---

14. In this regard, plaintiffs' reliance on *Hackley v. Roudebush*, 520 F.2d 108, 156 n. 193 (D.C. Cir.1975) is misplaced. That case is in accord with our view. It held only that the transcript (as opposed to its substance) could come in under 803(6) or 803(8)(B), subject to objection to the testimony itself grounded upon 804(b)(1) or 801(d)(1) and (2).

15. It is expected that the trial judge would, in any event, give a limiting instruction to the jury to the effect that they are not bound by the public agency finding, but rather must consider it as evidence along with all the other evidence.

the evidentiary questions before us, we have fashioned a number of additional criteria for evaluating trustworthiness.[16] Each of these criteria has emerged from the crucible of our hearings, and is responsive to what we perceive to be a legitimate concern about the trustworthiness of the reports and findings proffered by plaintiffs. The criteria are responsive to a number of questions about the scope of Rule 803(8)(C) which have not been addressed, or at least extensively developed, in the caselaw. These criteria, which we shall apply in our trustworthiness evaluation, in addition to the Advisory Committee's four criteria, are as follows:

(1) The finality of the agency findings, *i. e.*, the state of the proceedings at which the findings were made (whether they are subject to subsequent proceedings or *de novo* review), and the likelihood of modification or reversal of the findings.

(2) The extent to which the agency findings are based upon or are the product of proceedings pervaded by receipt of substantial amounts of material which would not be admissible in evidence (*e. g.* hearsay, confidential communications, ex parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding.

(3) If the findings are products of hearings, the extent to which appropriate safeguards were used (Administrative Procedure Act, Due Process), and the extent to which the investigation complied with all applicable agency regulations and procedures.

(4) The extent to which there is an ascertainable record on which the findings are based.

(5) The extent to which the findings are a function of an executive, adminis-

trative, or legislative policy judgment (as opposed to a factual adjudication) or represent an implementation of policy.

(6) The extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as the result of trustworthiness evaluation.

(7) Where the public report purports to offer expert opinion, the extent to which the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in the particular field.

There was considerable dispute about all of these matters during the course of the hearings. The foregoing formulation represents a conclusion on our part that public records and reports will fail to pass trustworthiness muster under the circumstances suggested in these criteria, which we shall now address briefly. Fuller explication will emerge from an application of these principles to the actual evidence before us.

■ Addressing our first additional criterion, we believe that where the proffered findings are preliminary, emerging at an early stage of the agency's proceedings,[17] and are not only subject to extensive reconsideration, but are highly susceptible to modification or reversal, they cannot be deemed trustworthy. The drafters of the Rule appear not to have contemplated that it might be used to admit administrative decisions which are subject to appeal, for unlike Rule 609(e)[18] nothing in the Rule precludes or qualifies its application when the findings that a party seeks to introduce are subject to extensive review. Given the absence of provision for such a situation by the drafters, we believe the appropriate course is to consider the preliminary finding a candidate for admissibility but to also consider the forthcoming review in deter-

---

**16.** Several of these criteria are essentially refinements of the Advisory Committee's criteria.

**17.** We recognize that not all 803(8)(C) material emanates from agency proceedings, *cf. Baker v. Elcona Homes*, 588 F.2d 551 (6th Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979), but in most cases it does. Moreover, the *Baker* sort of case, which in-

volved a police investigation report of a motor vehicle collision, is usually much simpler to deal with.

**18.** Rule 609(e) provides: "The pendency of an appeal therefrom does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible."

mining whether or not the findings are trustworthy.[19] Of course, if administrative findings are reversed, rejected, or overruled on appeal, the rejected findings must be deemed untrustworthy, as we have occasion to discuss in more detail below in connection with the CF29's. *See* Saltzburg and Redden, *Federal Rules of Evidence Manual* (2d Ed.Supp.1980) at 152.

■ In sum, we think that the effect on admissibility of the fact that a particular finding was made in the "first inning," so to speak, of a protracted process should be considered under the rubric of trustworthiness and not, as the defendants contend, as part of the definition of "findings." The dangers of modification or reversal were demonstrated in the *Plywood* litigation, *supra*, when the decision of the FTC (though not the findings actually introduced) was recently reversed. *See Boise Cascade Corp., et al.,* [1978] Trade Reg.Rep. ¶ 21,393, *enforcement denied, Boise Cascade Corp. v. FTC,* [1980–2] Trade Cases ¶ 63,323. We turn to our second, third, and fourth additional criteria, which we shall address together.

■ The fact that the findings were based in part on hearsay or on confidential sources which were not divulged to the defendants does not ipso facto render the findings so untrustworthy as to be inadmissible. No court has held that in order to be admissible under 803(8)(C) findings must result from proceedings with *all* the procedural protection afforded under the APA or in judicial proceedings. Such an interpretation would be at odds with the failure of the drafters of 803(8)(C) to require first hand knowledge by the investigator or a duty to report by those contributing information. It would also conflict with the Advisory Committee's "assumption that a public official will perform his duty properly," *i. e.,* will exercise his judgment and give appropriate weight to the various types of evidence relied upon by the government. Moreover, given the fact that most 803(8)(C) reports are in the nature of expert

reports, such a construction would be inconsistent with Rule 703, which provides that the facts and data forming the basis for an expert opinion need not themselves be admissible so long as they are of a type reasonably relied upon by experts in the particular field.

■ We believe, however, that findings cannot be deemed trustworthy where they emerge from proceedings that are pervaded by the receipt of ordinarily inadmissible material or that are notably lacking in procedural safeguards, although appropriate weight must be accorded where the agency has complied with its own procedures. *Cf. Lloyd v. American Export Lines, supra,* 580 F.2d at 1189 (judgment of Japanese court held admissible under 803(22) where foreign proceedings accorded with "civilized jurisprudence" and were "stated in a clear and formal record").

Thus, when hearsay dominates, the report may be excluded. *See Swietlowich v. County of Bucks,* 610 F.2d 1157, 1165 (3rd Cir. 1979) (district attorney's report proffered in civil rights litigation excluded because based on hearsay); *John McShain, Inc. v. Cessna Aircraft Co., supra* (National Transportation Safety Board report based upon hearsay statements excluded); and see *Melville, supra,* where one FAA airworthiness directive which rested on hearsay was excluded. 443 F.Supp. at 1115, n. 75. *But see* n. 21 *infra.*

■ The fifth additional criterion we have set forth—the extent to which the findings are a function of an executive, administrative, or legislative policy judgment or represent an implementation of policy—is essentially a variation on the theme of "motivational problems" identified as one of the Advisory Committee's trustworthiness criteria, although we think it different enough to warrant separate discussion. In our view, where there exists within an agency a preconceived notion of the policy that the agency is attempting to implement, *e. g.,* sheltering United States industry from

19. The availability or pendency of review should also be a factor which may be presented

to the trier of fact to influence the weight given the finding. *Cf.* F.R.E. 609(e).

what are perceived as the deleterious effects of unfettered international competition, see Part IV infra, the "findings" of that agency are to at least some degree a function of that preconceived notion, and though they may be "trustworthy" in light of the particular policy objectives the agency is attempting to further, they may or may not be trustworthy for other purposes. Overriding policy concerns bring into question the objectivity of an agency's findings just as the objectivity of a report prepared in anticipation of litigation, Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), may be questionable.

The final criterion upon which we need comment at any length is the last additional criterion we have listed—where the public report purports to offer expert opinion, the extent to which the facts or data upon which the opinion is based are ascertainable and/or are of a type reasonably relied upon by experts in the particular field.[20] That criterion is a function of the close relationship between 803(8)(C) and F.R.E. Article VII (the opinion evidence rules), which we discussed in our opinion in Melville, 443 F.Supp. at 1114–15, and of which the court of appeals likewise took cognizance. 584 F.2d at 1316. As we have suggested above, 803(8)(C) evaluative findings are frequently offered for their underlying (or overriding) expertise; hence, implicit in the trustworthiness determination is the right to attack: (1) the agency's expertise, see Advisory Committee Note ("the special skill or experience of the official"); (2) the basis of its opinion or finding, and (3) its helpfulness to the jury (F.R.E.

702). Just as an opinion may be held inadmissible if its basis is sufficiently tainted, so may a public record or report which is in effect an opinion.[21]

We have considered plaintiffs' argument that 803(8) and the opinion evidence rules differ in that the latter require a foundation to be laid prior to the introduction of the expert's testimony whereas 803(8) omits the foundation requirements. This argument is answered in Melville, supra, 443 F.Supp. at 1115—in the case of public records and reports, the foundation can be attacked under the trustworthiness rubric. "[W]here the foundation of an opinion would be discredited under Rule 705 cross–examination, the presumptive trustworthiness of the opinion might well be sufficiently impugned to disqualify the report under 803(8)(C), thus requiring the proponent of the report either to produce the declarant for purposes of cross–examination or to forego use of the evidence."

We have also considered, and concur with, plaintiffs' contentions that there is no requirement in the F.R.E. that evidence be dispositive of a particular factual issue to be admissible. Where a public record or report passes the trustworthiness threshold, its weight is for the jury, subject to evidence and argument by the opposing party that the report is not trustworthy (and also subject to the overriding requirement that if the probative value of the report is outweighed by the delay involved in litigating trustworthiness, it may be excluded under F.R.E. 403. John McShain,

20. We have not independently discussed additional criterion # 5. The reason this criterion bears upon the question of trustworthiness is self–evident. Where a finding merely reiterates or depends in significant measure upon a finding made by another investigatory body, its trustworthiness is a function of the trustworthiness of the procedures used by the agency that made the finding initially.

21. Cf. Fraley v. Rockwell Int'l Corp., 470 F.Supp. 1264 (S.D.Ohio) (1979), where Judge Rubin permitted introduction of a Naval Rework Facility report containing conclusions about the causes of an airplane crash. Even though the report was based exclusively on

hearsay, it was held admissible because the hearsay was provided by persons with first–hand knowledge and the report was prepared by an experienced investigator. Judge Rubin excluded a second report that discussed general circumstances surrounding the crash because it was prepared by an inexperienced investigator. In a related case, Sage v. Rockwell Int'l Corp., 477 F.Supp. 1205 (D.N.H.1979), Judge Loughlin permitted introduction of both reports, ruling that the experience or inexperience of the investigator preparing the report was a factor that went to weight and not admissibility.

*Inc. v. Cessna Aircraft Co., supra* ). However, the court's obligation to make the threshold determination, at an *in limine* hearing, remains. This determination, as we see it, must come from a balancing process wherein all of the relevant factors are evaluated. Where the public report is in the nature of an expert opinion, those factors include a consideration of whether the agency possesses sufficient expertise, *see* n. 21, *supra*, whether the factual basis of the report is flawed, and whether the facts or data upon which the opinion is based are ascertainable and/or are of a type reasonably relied upon by experts in the field.

Against this background, we turn to consideration of the 1921 Antidumping Act material.

### III. *The 1921 Antidumping Act Material*
#### A. *Introduction*

The plaintiffs have submitted for consideration seven documents arising out of proceedings instituted by the Treasury Department under the 1921 Antidumping Act, 19 U.S.C. § 160, *et seq.* (repealed 1980). We have sketched the procedure under the 1921 Act in our opinion filed on April 14, 1980, 494 F.Supp. 1190, dismissing the greater part of plaintiffs' claims under the Antidumping Act of 1916. The chronology of the proceeding may be gleaned from a description of the documents before us, listed by their DSS numbers:

1. The Antidumping Proceeding Notice, 33 FR 8851 (1968);

2. The Withholding of Appraisement Notice, 35 FR 14100 (1970);

3. The Treasury Department Determination of Sales at Less Than Fair Value, 35 FR 18549 (1970);

4. Determination of Injury, United States Tariff Commission Investigation No. AA1921–66 (undated);

5. Notice of Dumping Duty to Be Imposed, 36 FR 4576 (1971) [consists of DSS # 4 with introductory text];

5A. The Treasury Department Finding of Dumping, 36 FR 4597 (1971); and

6. Numerous Customs Form 29's (various dates in 1978) [appraising dumping duties against various defendants and other importers].[22]

The defendants' objections to the 1921 Act submissions are manifold and we shall take them up in detail as we discuss each document. Suffice it to say by way of introduction that defendants' overriding arguments fall into the following categories:

1. The documents do not constitute findings within the meaning of § 803(8)(C).

2. The documents are not trustworthy.

3. The documents are not relevant.

4. Any minimal probative value the documents may have is outweighed by the factors listed in Rule 403.

It would take chapters, not pages or paragraphs, to describe the labyrinthine procedures under the 1921 Antidumping Act. Those proceedings, to paraphrase the old movie title, are a many–layered thing. Moreover, although the proceedings with which we are now concerned have been going on for years, they are nowhere close to resolution. On a fair estimate, it might take another decade before they are resolved, that is if the settlement recently entered into between the Treasury Department and the respondents in that proceeding is overturned in court.[23] We will not describe the entire procedure here; it is amply developed in the record. However, we will sketch the major events in the twelve–year history of the proceeding as a necessary background to our consideration of the defendants' evidentiary objections.[24]

---

22. The record contains thousands of CF29's. However, as we have noted, *supra*, they all raise the same issues and can be disposed of together.

23. *See* pp. 1153–1154, *infra*.

24. The following account of the proceedings under the 1921 Act is taken from the public record consisting of the notices published in the Federal Register, i. e. DSS # # 1–5A themselves; from papers filed by the government in *Committee to Preserve American Color Television v. Miller*, No. 79-1948 (D.C.Cir.), copies of

## B. *The 1921 Act Proceedings*

An administrative proceeding under the 1921 Antidumping Act could be initiated by the Customs Service *sua sponte* or by any person who had information that merchandise was or was likely to be imported into the United States under circumstances bringing it under the purview of the Act, and who communicates that information in writing to the Commissioner of Customs. The Japanese television proceeding was initiated by the receipt of information from the law firm of Lincoln & Stewart on behalf of the Imports Committee of the Tube Division of the (United States) Electronic Industries Association. In accordance with applicable customs regulations, the Commissioner of Customs then undertook a summary investigation to determine whether or not the information was "patently in error" or whether for other reasons further investigation was not warranted. Following that summary investigation, the Commissioner published in the Federal Register an "Antidumping Proceeding Notice," as was required by the regulations whenever a proceeding was not discontinued after the summary investigation. That notice constitutes DSS # 1. The notice stated, in principal part, that information had been received in proper form which tended to indicate that television receivers from Japan were being sold at less than fair value, within the meaning of the Act, and that the Customs Bureau was "instituting an inquiry . . . to determine the validity of the information." 33 Fed.Reg. 8851 (June 18, 1968).

In the course of that inquiry, Treasury officials investigated the prices during the six–month period from November, 1967 to May, 1968 of five Japanese companies: Matsushita, Hitachi, Toshiba, Sharp, and Sony. The "less than fair value" ("LTFV") investigation lasted for two and one–half years, during which time Customs officials sought to determine the "purchase price," the "exporter's sales price," and the "home market price," as defined in the 1921 Act and in regulations promulgated thereunder. The determination whether or not LTFV sales had been made depended upon whether the "purchase price" or "exporter's sales price," representing prices in the United States, were lower than "home market price," representing prices in Japan. The three types of prices on which the determination was based were not actual transactional prices, but were constructs derived by applying to actual transactional prices a variety of adjustments reflecting, for instance, freight charges, selling expenses, or differences in the circumstances of sale. The LTFV proceedings consisted primarily of the verification of transactional price data submitted by the five Japanese manufacturers, and of decisions, made informally by anonymous Treasury officials after *ex parte* contacts with representatives of United States and Japanese manufacturers, to allow or disallow adjustments claimed by the Japanese manufacturers.[25]

After the Antidumping Proceeding Notice, the next step in the formal 1921 Act

---

which have been made available to us by the defendants; and from the affidavits submitted by the defendants. Those affidavits were signed and sworn by A. Paul Victor, who is counsel of record for the Matsushita defendants in this action and also represented Matsushita in the 1921 Act proceedings, and by Lawrence R. Walders, who is counsel of record for the Hitachi defendants in this action and represented Hitachi and others in the 1921 Act proceedings. The plaintiffs have not controverted any of the material averments of the Victor and Walders affidavits, except to point out that judicial review of the LTFV and injury findings are not equivalent to a trial *de novo, see* n. 26, *infra.*

**25.** According to the Walders affidavit, *see* n. 24, *supra,* the adjustments claimed by Hitachi and other companies for differences in the circumstances of sale of television receivers in the U.S. and in Japan would have eliminated the apparent margin of dumping if the adjustments had been granted instead of disallowed. Hitachi claimed adjustments to reflect, for example, cash discounts to retailers in Japan, costs of sales promotion in the Japanese market, and interest costs incurred in Japan. Hitachi was notified in informal conferences with Treasury officials that each of these claimed adjustments were disallowed, in whole or in part, but no written statement of the reasons for the disallowance was ever made, and Hitachi continues to maintain that the claimed adjustments should have been granted.

procedures, as set forth in Treasury Regulations, was the publication of a "Withholding of Appraisement Notice" if the Commissioner of Customs determined that there were "reasonable grounds to believe or suspect" that LTFV sales had been made. In conjunction with that notice, customs officials were directed to withhold their appraisement of imported merchandise of the specified type. The Withholding of Appraisement Notice in the Japanese television proceeding was published in the Federal Register on September 4, 1970, 35 Fed. Reg. 14100, and is DSS # 2 in the litigation now before us.

Following the publication of that notice, the Treasury Department held an informal hearing on October 14, 1970, to permit interested persons to make oral presentations of their views. No testimony was taken at that hearing, and no record was made; indeed, the participants were forbidden to make a transcript of the hearing by electronic or other means. The ultimate decisionmaker in the LTFV phase of the proceedings, Assistant Secretary of the Treasury Eugene T. Rossides, did not attend the hearing.

On December 5, 1970, the final result of the LTFV inquiry was published in the Federal Register, 35 Fed.Reg. 18549. This "Determination of Sales at Less Than Fair Value" is now offered as DSS # 3. In it, Assistant Secretary Rossides found that television receivers from Japan were being sold at less than fair value, within the meaning of the 1921 Act. The determination, which occupies little more than one column on one page of the Federal Register, was based on a comparison of either the "purchase price" or the "exporter's sales price" with the "home market price." Although the LTFV finding did not state the magnitude of the margin between United States and Japanese prices, subsequent statements of customs officials, which are in the record before us, put the LTFV margin at 2.2%. The determination listed, in a conclusory fashion, the types of adjustments which had been made to arrive at each of the price constructs, but offered no statement of the reasons why particular adjustments were made, the amounts of the adjustments, the models and categories of television receivers with respect to which each adjustment was made, or the manufacturer with respect to whose prices the adjustments were made. The determination made no mention whatever of the adjustments claimed by the manufacturers which Treasury officials had disallowed and, in particular, gave no statement of the reasons for disallowance of such claimed adjustments.

Following the LTFV determination, the 1921 Act proceeding was referred to the United States Tariff Commission in accordance with 19 U.S.C. § 160(a) for an investigation as to whether an industry in the United States was being injured by reason of LTFV sales of television receivers from Japan. An evidentiary hearing was held before the Tariff Commission, which issued its "Determination of Injury" on March 4, 1971. The Commission considered confidential submissions from American manufacturers which were not divulged to counsel for the importers. At the evidentiary hearing, counsel for the importers were not permitted to cross-examine witnesses with respect to confidential data to which those witnesses referred during direct testimony.

The Tariff Commission found that an industry in the United States was being injured by reason of the importation of television receivers from Japan which were being sold at LTFV prices. It found the injured industry to consist of "the facilities in the United States for the production of television receivers," and noted that there were approximately 20 firms in the industry. The Commission's report did not mention any firm individually, but discussed only injury to the industry as a whole. A typescript of the report is offered in this litigation as DSS # 4, and the nearly identical version published in the Federal Register is offered as DSS # 5, 36 Fed.Reg. 4576.

According to the statutory scheme of the 1921 Act, after a finding of LTFV sales by the Treasury Department and a finding of injury by the Tariff Commission have both

been made, the Secretary of the Treasury was required to publish a finding of dumping. 19 U.S.C. § 160(a). The publication of a dumping finding was a purely ministerial act since it was an automatic consequence of the LTFV and injury findings. *See Timken Co. v. Simon*, 539 F.2d 221 (D.C.Cir. 1976). In the Japanese television proceeding, a "Finding of Dumping" was published on March 10, 1971, 36 Fed.Reg. 4597. This finding, which is proffered as DSS # 5A, consists of a brief report of the LTFV and injury determinations, and an announcement of the formal finding of dumping with respect to television receivers imported from Japan.

Following the issuance of the dumping finding, the Customs Service commenced the process of liquidating the dumping duties owed by each importer of Japanese television receivers. By statute, the duty equalled the difference between the purchase price or exporter's sales price and the foreign market price. 19 U.S.C. § 161(a). During the liquidation process, the Customs Service addressed for the first time the responsibility of particular importers for sales in the United States at lower prices than those charged for comparable merchandise in Japan. The liquidation of duties proceeded extremely slowly. Until March 31, 1978, seven years after the dumping finding and ten years after the initiation of the proceeding, no duties had been assessed against any importers. The Customs Service had undertaken the laborious task of requiring and then reviewing voluminous submissions from each importer of Japanese television receivers, concerning transactional prices and claimed adjustments. However, early in 1978, the Customs Service decided to accelerate the assessment of duties by discarding the traditional method of determining foreign market price, relying instead on calculations based on the commodity tax levied upon Japanese manufacturers by the Japanese government. This so–called "Japanese commodity tax formula" consisted of multiplying the retail price in Japan by a fixed factor of .5391 to determine a projected ex–factory wholesale price. No adjust-

ments were made to the figure derived by application of the "Japanese commodity tax formula," although the statute and regulations promulgated thereunder required that many types of adjustments be made in the determination of foreign market price.

Beginning on March 31, 1978, the Customs Service assessed dumping duties based upon the unadjusted foreign market value calculated by means of the commodity tax formula. The initial assessment, covering imports made through June 30, 1973, totalled approximately $46 million. The Customs Service estimated that the total amount of dumping duties assessed on the basis of the unadjusted commodity tax formula would be approximately $500 million. The customs forms notifying importers of the assessment of duties on the basis of the Japanese commodity tax formula, known as CF29's, are proffered in this litigation as DSS # 6. There are literally thousands of CF29's in the record, as a separate form was prepared for each entry of merchandise into the United States during the relevant period.

The duties assessed in 1978 were subject to administrative review as a result of protests filed by the importers. The protest decisions addressed a variety of objections, but primarily consisted of decisions to allow or disallow certain claimed adjustments to the commodity tax formula. As a result of adjustments made by the protest decisions, the $46 million assessed for dumping duties through June 30, 1973 was reduced by more than 80% to less than $8 million.

On January 1, 1980, the responsibility for the administration of antidumping proceedings was shifted from the Treasury Department to the Commerce Department, pursuant to Executive Order No. 12188 and Reorganization Plan No. 3 of 1979. After a review of the Japanese television proceeding, Homer E. Moyer, Jr., General Counsel of the Commerce Department, recommended to the Secretary of Commerce that the proceeding be settled by a compromise of the government claims. The claims were settled on April 28, 1980, for payments of $77 million in return for a release of any

liability for antidumping duties resulting from imports made before April 1, 1979. The operation of the settlement agreements has been stayed, however, by order of the United States Court of Appeals for the District of Columbia in litigation brought by an organization which represents the interests of domestic television producers. *Committee to Preserve American Color Television v. Miller*, No. 79–1948. Moreover, Zenith has brought an action in the United States Customs Court to challenge the determinations reflected in the settlement.

If the settlement agreements are invalidated for any reason, or if the proceeding had never been settled, the importers against whom dumping duties had been assessed would have a right to seek judicial review of the proceeding in the United States Customs Court. In fact, Matsushita sought to raise due process objections to the LTFV investigation in the Customs Court in 1971, but its suit was dismissed as premature, since challenges to the LTFV finding could be heard after the liquidation of duties. *Matsushita Electric Industrial Co. v. U.S. Treasury Department*, 67 Cust.Ct. 328, 333, C.D. 4292 (1971), *aff'd*, 485 F.2d 1402, 60 C.C.P.A. 85, *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Thus, the scope of review in the Customs Court could potentially include such matters as procedural objections to the LTFV proceedings which were completed in 1970.[26]

---

**26.** The plaintiffs contend that the LTFV and injury findings would not be triable *de novo* in the Customs Court, but would be subjected to a lesser standard of review. The leading decisions of the Court of Customs and Patent Appeals have held at least that those findings must be upheld if they are supported by substantial evidence, and also contain strong indications that the standard of judicial review is even narrower, amounting to an "arbitrariness" standard. *Imbert Imports v. United States*, 475 F.2d 1189, 60 C.C.P.A. 123 (1973); *City Lumber Co. v. United States*, 457 F.2d 991, 59 C.C.P.A. 89 (C.C.P.A.1972); *Kleberg & Co. v. United States*, 71 F.2d 332 (C.C.P.A.1933). Some recent decisions of the Customs Court have applied this narrow standard of review. *E.g., Armstrong Bros. Tool Co. v. United States*, C.D. 4838 (Cust.Ct. Jan. 28, 1980), *appeal pending*, No. 80–20 (C.C.P.A.); *SCM Corp. v. United States*, C.R.D. 80–2 (Cust.Ct. Mar. 7, 1980). However, in *Michelin Tire Corp. v. United States*, C.R.D. 79–6 (Cust.Ct. Feb. 26, 1979), Judge Watson of the Customs Court ruled that the line of appellate decisions commencing with *Kleberg* was no longer valid because of intervening developments in the law, and stated in dictum that a *de novo* trial should be available in actions challenging LTFV and injury determinations under the 1921 Act. In its report on the Trade Agreements Act of 1979, which enacted a new antidumping law, the Senate Finance Committee commented that the law concerning the scope of review of antidumping findings under the 1921 Act, particularly the availability of *de novo* review, was "unclear and conflicting." S.Rep.No. 96–249, 96th Cong., 1st Sess. at 251 (1979), 1979 U.S. Code Cong. & Admin.News p. 381. The Committee added that antidumping findings under the 1979 Act would not be subject to *de novo* review because procedural changes made by the 1979 Act "have eliminated any need for *de novo* review." *Id.* at 251–52, 1979 U.S.Code Cong. & Admin.News p. 637.

We need not determine whether the antidumping findings proffered here are subject to *de novo* review, to review on a substantial evidence standard, or only to review to determine whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Even the narrowest of the standards of review which have been applied to antidumping findings requires the Customs Court to "engage in a 'searching and careful' inquiry into the facts." *SCM Corp., supra,* quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The pertinent fact is that the findings are still subject to judicial review which is more than cursory, however the standard of review is articulated.

Moreover, in *SCM Corp.*, the Customs Court ordered the International Trade Commission to provide a fuller statement of its subordinate factual findings and the reasons for its finding of non–injury under the 1921 Act, in order to make meaningful judicial review possible. We think that the LTFV finding lacks a sufficient statement of reasons and subordinate factual findings, and this deficiency is a significant factor which has contributed to our decision that the finding is untrustworthy. If the LTFV finding were reviewed by the Customs Court, that court might agree with us that the statement of reasons is deficient, and follow *SCM Corp.* by ordering what is in effect a remand of the entire LTFV investigation to the administering agency.

Whatever the scope of review of the findings may be, there is a separate issue as to whether the defendants' objections to the *procedures* employed in the LTFV investigation are cognizable in the Customs Court. While we are aware of no customs decision which specifically addresses this question, or indicates what degree of deference should be afforded to agen-

Any decision of the Customs Court might be appealed to the Court of Customs and Patent Appeals and, if certiorari were granted, to the Supreme Court.

### C. The Hearsay Objection—Are the Exceptions Satisfied?

### 1. Introduction

The seven documents that plaintiffs offer from the 1921 Act proceedings are plainly hearsay and, accordingly, are not admissible in evidence unless they fall within one of the hearsay exceptions. The only exception which appears to be relevant is Rule 803(8)(C). The defendants contend that the documents do not fall within that exception because they are not findings, and because they are not trustworthy.

We turn first to the objection that the documents, or at least some of them, are not findings. DSS#s 1 and 2 may be disposed of quickly; they are mere preliminary notices and not findings. Although they may properly be termed reports setting forth the activities of the Customs Service and/or matters observed pursuant to a duty imposed by law and are therefore admissible under the exceptions of Rule 803(8)(A) and (B), their admissibility as substantive proof of dumping violations is perforce conditioned upon the admissibility of DSS#s 3 to 6. DSS#s 3 through 6 may be fairly characterized as "findings," in the ordinary–language sense. The question nonetheless arises as to whether they are findings within the meaning of 803(8)(C), because they are subject to extensive administrative and judicial review.[27] As we have explained in Part II, supra, we think that the effect on admissibility of the fact that a particular finding was made in the "first inning," so to speak, of a protracted process should generally be considered under the rubric of trustworthiness and not, as the defendants contend, as part of the definition of "findings."

We turn then to the trustworthiness issues raised with respect to each document.

### 2. The LTFV Findings

The question of the trustworthiness of the LTFV findings is not free from difficulty. Three of the four factors identified in the Advisory Committee Note do not militate against their admission. The investigation was timely; the investigating officials were professionally responsible for investigations of this sort,[28] and there is no hint of any motivation problems underlying the investigation.[29] However, the answer to the question of whether hearings were held and at what level is unclear. It is plain that no evidentiary hearing was held, although the parties involved had an informal opportunity to be "heard" by conferring ex parte with the investigators to tell their side of the story and respond to questions. There also was an opportunity for the lawyers to argue to the investigators at a sort of "hearing." Yet, the ultimate decision–maker, the Assistant Secretary of the

cy procedures, the reasoning of the *Matsushita* decision, cited in the text, suggests that such procedural objections could appropriately be considered in the Customs Court after the liquidation of duties.

The plaintiffs concede that appraisements of particular entries of merchandise, including the value determinations which underlie the assessment of antidumping duties in the CF 29's, are subject to a *de novo* trial in the Customs Court. *See F.W. Myers & Co. v. United States*, 376 F.Supp. 860 (Cust.Ct.1974).

**27.** DSS # 5A is also assailed as a "non–finding" since its publication, as we have noted, is an automatic consequence of the LTFV and injury findings. We view DSS # 5A as a combined report of the results of the LTFV and injury investigations and its ministerial nature therefore does not affect its status as a "finding." Its trustworthiness and relevance can be no greater, of course, than that of the LTFV and injury findings upon which it rests.

**28.** There is nothing in the record to indicate the personal or professional qualifications of the officials who were responsible for the LTFV Investigation.

**29.** While the defendants remind us that the proceedings were not antitrust–oriented, the motivation problems contemplated by the Advisory Committee Note are not of the nature which defendants suggest. *See id.*, citing *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). *But see* additional criterion # 5 and discussion *supra* at 1147.

Treasury, Mr. Rossides, was not present at any of the hearings and apparently made the ultimate LTFV finding on the basis of staff reports which may have been oral and therefore unrecorded.

Furthermore, significant problems arise from application of the additional criteria that we have posited. First, while the investigation apparently complied with the Treasury Department's applicable regulations and procedures, the finding is undeniably the product of proceedings pervaded by receipt of substantial amounts of material which would not be admissible in evidence: hearsay, confidential communications, and *ex parte* evidence. Second, there appear to have been few if any safeguards, like the opportunity to cross–examine witnesses, attendant to the investigative and "hearing" process. Third, there is no ascertainable record on which the finding is based. Fourth, the LTFV finding was made at the nascent stage of the investigation, many years before the actual assessment of duties on particular entries of merchandise. Fifth, the finding would still be subject to searching judicial review, proba-

bly, though not certainly, on a narrow standard of review, see n. 26, supra, were it not for the recent settlement of the government's claims.[30] Finally, the LTFV finding contains no statement of the reasons for allowance or disallowance of particular adjustments, a matter which was crucial to the outcome of the LTFV investigation, and no formal statement of these reasons was ever given.

It is of some significance that both Congress and the Treasury Department have made substantial changes in the procedures employed in administrative proceedings under the 1921 Act and its successor legislation in the years since the LTFV investigation of Japanese television receivers in 1968–70. The current procedures not only rectify the long delays under the previous procedures, but also require that an evidentiary hearing be held in all LTFV investigations and permit interested parties to have access to confidential submissions made to the administering authority, under the protection of a confidentiality order limiting public access to the submissions.[31]

**30.** The defendants contend that the LTFV finding has already been decisively repudiated by responsible officials of the Commerce Department in connection with the settlement of the Government claims. While we accept the defendant's parallel argument with respect to the CF29's, we do not find an equivalent repudiation of the LTFV finding in the documents upon which the defendants rely. While Homer Moyer, the General Counsel of the Commerce Department, has in our view conceded that the CF29's would probably be overturned upon judicial review because of use of the commodity tax formula, see pp. 1157–1158, *infra*, that formula played no part in the LTFV investigation. Although Mr. Moyer expressed some concern about other aspects of the proceedings in his memorandum recommending settlement of the government's claims, those references were merely assessments of litigation risks of the sort that any attorney would undertake in considering settlement of a case. Thus, we do not view any aspect of the proceeding, except the CF29's, which rested on commodity tax formula, as repudiated by the government.

In addition, the defendants contend that a provision of the settlement agreement itself constitutes an official repudiation of the entire 1921 Act proceeding. In one paragraph which appears to have been included in the settlement agreements negotiated with each importer, the

government represents that it "knows of no violation" of the antidumping law. While it is common in settlement agreements to recite that the settlement does not constitute an admission of liability, this statement is extraordinary, going far beyond the "boiler plate" practice. However, we do not believe that we can accord the statement or the settlement agreements any effect so long as they are subject to the stay entered by the D.C. Circuit, see p. 1153, *supra*.

**31.** The procedures employed in antidumping proceedings have been changed since 1970 to eliminate any questionable and delay causing practices. The first change was an amendment to Treasury regulations, 37 Fed.Reg. 26299 (1972) which imposed a nine–month deadline for LTFV investigations, with an extension to a twelve–month deadline in complicated cases. In 1974, Congress incorporated those time limits into the 1921 Act itself, as amended in the Trade Act of 1974, Pub.L.No. 93–618. *See* 19 U.S.C. § 160(b). In the same act, Congress added a new provision to the 1921 Act which required both the Secretary of the Treasury and of the Tariff Commission to publish a "complete statement" of their findings and conclusions and the reasons or bases therefor on all of the material issues of fact or law presented. 19 U.S.C. § 160(d)(2). The Act also, for the

For the reasons indicated in Part II, *supra*, we must engage in a balancing procedure, a qualitative analysis of the factors involved in the trustworthiness balance. On balance, we find the defendants to have met the burden of showing the LTFV findings to be untrustworthy. We have commented upon the timeliness of the investigation, the professional responsibility of the investigating officials for this type of matter, the lack of motivation problems, and the apparent compliance with agency rules in force at the time. However, we believe that the weight of the six factors mentioned in the preceding paragraphs is so strong as to outweigh the others. We turn to the trustworthiness of the injury finding.

### 3. *The Injury Finding*

 The defendants' principal objections to the trustworthiness of the injury finding are that it is based on the LTFV finding, and that the Tariff Commission considered confidential sources of evidence, including a confidential submission from the Treasury Department as well as from domestic manufacturers, upon which the defendants were not allowed to cross-examine witnesses at the evidentiary hearing.

As our previous discussion suggests, the consideration of confidential sources of evidence does not in and of itself render the Commission's findings inadmissible. We need not proceed through the balancing process which would be necessary to assess the reasonableness of the Commission's procedures, however, for the Commission's finding of injury "by reason of" LTFV sales logically depends upon the foundation of the LTFV finding and assumes the latter's validity. Accordingly, the injury finding can be no more trustworthy than the LTFV finding upon which it is based.

### 4. *The Dumping Finding*

 The Finding of Dumping, DSS # 5A, is a composite report of the LTFV and injury findings. As such, it is no more or less trustworthy than the two underlying findings. Because, for the reasons we have already articulated, the LTFV finding is not trustworthy, the dumping finding is not either, and cannot be admitted.

### 5. *The CF29's*

 The CF29's, DSS # 6, present different issues of trustworthiness. We need

---

first time, imposed a statutory requirement that hearings be conducted by both the Treasury Department and the Commission. In contrast to the absence of a hearing record in the television case, the Trade Act required the Treasury Department as well as the Commission to make a transcript of all hearings conducted. The statute continued to provide for non-disclosure of confidential information. 19 U.S.C. § 160(d)(3). These statutory changes were implemented by the Treasury Department in regulations issued on June 25, 1976, 41 Fed.Reg. 26203. The provisions for hearings are set forth in Section 153.40 of the regulations, 41 Fed.Reg. 26212.

On March 23, 1978, the Customs Service issued a new regulation providing for disclosure conferences wherein customs officials would advise interested parties of the reasons for tentative determinations. 43 Fed.Reg. 11982. The disclosure conferences which were held after publication of tentative LTFV determinations gave interested parties an opportunity to learn the bases for the calculations. This information helped the parties make a meaningful presentation to the Treasury Department in briefs and oral argument, unlike the situation in the television case where the participants at the LTFV "hearing" had no clear idea of the ration-

ale for the decision, according to the uncontroverted affidavits before us.

The law and procedures for the conduct of antidumping investigations were further revised in the Trade Agreements Act of 1979, P.L. 96 39. That statute repealed the Antidumping Act, 1921, and adopted new antidumping provisions, 19 U.S.C. §§ 1673-1673i (1980). While the Trade Agreements Act largely retained the substantive law of the 1921 Act, it made significant changes in the procedures for the conduct of investigations. Of particular interest are the provisions for access to confidential information that is submitted to the International Trade Commission (the successor to the Tariff Commission) and the Commerce Department (which was given jurisdiction over LTFV investigations). The statute provides for the disclosure under protective order of confidential information which is submitted in confidence to the Commission or the administering authority (the Commerce Department) during the course of an investigation. 19 U.S.C. § 1677f(c). Detailed provisions for disclosure under protective order are set forth in Section 353.30 of the new Commerce Department regulations, 45 Fed.Reg. 8182, 9197 (February 6, 1980), and Section 207.7 of the ITC regulations, 44 Fed. Reg. 76458, 76461 -2 (December 26, 1979).

not consider any objections to the procedures used to arrive at the CF29's, since they are untrustworthy for a more compelling reason: they have been overturned by subsequent administrative protest decisions, and have been repudiated by high officials of the responsible agency.

The CF29's that plaintiffs offer are those issued *prior* to administrative protest decisions that reduced the total amount of duties assessed for the relevant period from $46 million to $8 million, i. e., by more than 80 percent. Even the post–protest decision assessments were based on the "commodity tax formula," which has been effectively repudiated by responsible officials. Homer E. Moyer, Jr., the General Counsel of the Commerce Department, made that repudiation clear in his memorandum to the Secretary of Commerce dated April 28, 1980, in which he formally recommended settlement of the government's claims. Moyer wrote:

"Although we could defend use of the Commodity tax formula (a considerable amount of work has gone into memoranda arguing that it is lawful), its legal defensibility is, in my judgment, questionable. The Justice Department, which would of course represent the department in any litigation, is of the view that we could sustain the Commodity Tax formula only if we are able to demonstrate that the prices derived from that formula are *identical* to actual sales prices in Japan. It is almost certain that we could not make such a showing.

"If a court were to hold that the Commodity Tax approach could not be employed under the Antidumping Act, the Government's claims for dumping duties would either have to be dropped or recalculated on the traditional basis." Exhibit B to Reply Memorandum of Matsushita Defendants at 6 (emphasis in original).

This statement goes far beyond an assessment of litigation risks and amounts to an admission that the commodity tax formula, and the assessments based thereon, would probably be found invalid on judicial review. Thus, we conclude that the CF29's are untrustworthy and are inadmissible under Rule 803(8)(C).

We turn now to the question of the relevancy of the LTFV, injury, and dumping findings. We need not consider the relevancy of the CF29's since they have been repudiated by the responsible officials as palpably inaccurate.

### D. *The Relevancy Objections*

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. "Evidence which is not relevant is not admissible." Rule 402. Although the standard of relevance is a liberal one, we conclude that it is not met here. We consider the relevance of DSS #s 3 through 5A in turn.

### 1. *The LTFV Finding*

■ The LTFV finding is irrelevant in this litigation for at least two reasons. First, the finding was a comparison of price constructs and not of actual transactional prices. Second, the finding is country-wide, and does not specify that any particular company sold in the United States at LTFV prices.

The basis for the LTFV finding was a comparison between "purchase price or exporter's sales price and adjusted home market price," 35 Fed.Reg. 18549, as defined in the Antidumping Act of 1921, and as calculated with deductions enumerated in the notice. *Id.* As we have noted, the basis was not a comparison of actual transaction prices in the United States or in Japan.

"Purchase price," defined in 19 U.S.C. § 162 "was calculated on the basis of f. o. b. or f. o. r. packed prices with deductions for freight, packing and *other charges* [unspecified] as applicable. The applicable Japanese commodity tax was added to this price." 35 Fed.Reg. 18549 (emphasis added).

"Exporter's sales price," defined in 19 U.S.C. § 163 "was calculated by deducting from the resale prices of the related firms

to distributors in the United States any applicable discounts to arrive at a net selling price. From the latter, appropriate deductions were made for inland freight in Japan, ocean freight and insurance, U.S. duty, brokerage charges, U.S. freight, warranty costs, packing, and commissions and other selling expenses incurred in the United States. To this additions were made for any applicable Japanese commodity tax refunded or not paid upon exportation of the merchandise." 35 Fed.Reg. 18549.

"Home market price" was defined in customs regulations as "the price (as defined in section 205, after adjustment as provided for in section 202 of the Antidumping Act, 1921, as amended (19 U.S.C. §§ 164, 161)), at which such or similar merchandise (as defined in section 212(3) of the Antidumping Act, 1921, as amended (19 U.S.C. § 170a(3)) is sold for consumption in the country of exportation on or about the date of purchase or agreement to purchase of the merchandise imported into the United States if purchase price applies, or on or about the date of exportation thereof if exporter's sales price applies." 19 C.F.R. § 53.3 (1970). In the Japanese television proceeding, home market price "was based on the delivered price to distributors in the home market. Appropriate deductions were made for discounts and rebates granted for cash, quantities, and certain sales promotions. From the net price, adjustments were made for commissions, warranty and installation costs, inland freight, inland insurance, patent fees, bad debts, where applicable, and packing. Adjustments were also made for differences in the merchandise and differences in advertising and credit costs." 35 Fed.Reg. 18549.

The Treasury Department's conclusion that LTFV sales had been made was merely the legal consequence of its finding that "Purchase prices or exporter's sales prices were lower than home market prices by amounts that were more than minimal in relation to the total volume of sales." 35 Fed.Reg. 18549. Because of all the adjustments in unspecified dollar amounts which were made to the three types of prices considered in the LTFV proceeding, that

finding is of no probative weight to support any conclusion about price differentials, either between actual transactional prices or between "adjusted" prices. Thus the finding has no tendency to make the existence of such price differentials more probable or less probable than their existence would be without the finding. F.R.E. 401.

The finding is plainly irrelevant to show differentials between actual transactional prices, since it is based on a comparison of price constructs. Nor is the LTFV finding probative of differentials between "adjusted" prices. Nothing in the finding or in the record before us suggests that the adjustments made in the LTFV proceeding are the same as those which the finder of fact might consider in this case. While it might be appropriate for the finder of fact to consider adjustments of the type made by Treasury in the LTFV proceeding, the nature and amounts of any such adjustments would have to be proved at trial. Since nothing in the finding indicates the amount of the adjustments, the factual circumstances underlying the determination that the adjustments should be made, or even the actual transactional prices to which adjustments were made, there is no basis in the LTFV finding for a jury to conclude that adjustments should be made on account of, e. g., the Japanese commodity tax. Furthermore, the adjustments which are applicable under the Sherman Act may be very different from those made under the 1921 Antidumping Act, a different statute with a different purpose. Accordingly, the finding is not even relevant to proof of "adjusted" price differentials in this Sherman Act litigation.

Of equal importance is the fact that the LTFV finding is country-wide. It does not constitute a finding that any particular defendant made LTFV sales. Nor, consequently, does it constitute a finding that all of them made LTFV sales. Rather, it is an undifferentiated finding that TV receivers "from Japan" were sold at LTFV prices, and is entirely consistent with any particular defendant's having made no LTFV sales. This is especially so for the many

defendants who were not investigated in the LTFV proceeding, but it is also true of the five defendants who were investigated since they were not named in the finding.

In *United States v. Bycer*, 593 F.2d 549 (3rd Cir. 1979), the Third Circuit reversed a jury verdict finding a pharmacist guilty of distributing controlled substances. The evidence had shown that the defendant's records failed to account for large quantities of controlled drugs, and that he and at least six other persons had access to the drugs. The Third Circuit found that the jury verdict was not supported by substantial evidence because, *inter alia*, others had access to the drugs. The fact that six persons might have distributed the drugs did not provide logical support for the conclusion that one of the six did distribute the drugs. Similarly here, the fact that an industry as a whole was found to have made LTFV sales does not provide logical support for the conclusion that any particular company made LTFV sales. We conclude that the LTFV finding is wholly irrelevant to this litigation, for the reasons stated.

### 2. The Injury Finding

■ The Tariff Commission finding is also irrelevant for at least two reasons. First, the Commission found that "an industry in the United States is being injured *by reason of the importation of television receiving sets, monochrome and color, from Japan sold at less than fair value within the meaning of the Antidumping Act, 1921, as amended.*" (Emphasis added). Since for reasons stated above LTFV sales are not relevant to the price differentials which are involved in this case, the finding of injury by reason of LTFV sales is irrelevant on its face.

Second, the Commission defines the injured industry as "facilities in the United States for the production of television receivers," and notes that the industry includes "approximately 20 firms," none of which is named in the Commission's report. Because it is a country–wide determination, the injury finding is not relevant to prove injury to Zenith or NUE. A finding of injury to an industry composed of 20 firms does not render it more probable that NUE or Zenith was injured by reason of LTFV sales. *See Bycer, supra.*

### 3. The Dumping Finding

■ The dumping finding is not relevant because it is a mere ministerial act which is the automatic consequence of the LTFV and injury findings. Combining the two previous findings and adding the label "dumping" cannot render the injury and LTFV findings more relevant than they are otherwise.

### E. Exclusion of Evidence Under Rule 403

Even if we were to assume that the documents we have discussed have some probative value, we must consider whether that value is outweighted by the factors enumerated in Rule 403: "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or ... considerations of undue delay, waste of time, or needless presentation of cumulative evidence." There is already a fairly well developed Rule 403 jurisprudence in this circuit. *See United States v. Long*, 574 F.2d 761 (3rd Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978); *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632 (3rd Cir. 1977); *United States v. Flenory*, 619 F.2d 301 (3rd Cir. 1980). The sweep of Rule 403 is best demonstrated by *Flenory*, where the court held that even an eyewitness identification of a suspect could under certain circumstances be excluded under 403. For the reasons that follow, we find that even if the documents in fact have some probative value, they would have to be excluded by reason of Rule 403.

### 1. Danger of Unfair Prejudice

■ Assuming arguendo the relevance of the findings, that relevance is at best minimal, yet because the findings bear the imprimatur of the United States government and use language ("less than fair value" and "dumping") that may unduly influence the jury, they present a substantial danger of unfair prejudice, similar to that

presented by the admission of a prior verdict against an antitrust defendant in another case.[32] In *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3rd Cir. 1975), the Third Circuit ordered a new trial specifically because evidence of a prior verdict was admitted. The court commented:

> A jury is likely to give a prior verdict against the same defendant more weight than it warrants. The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it.

525 F.2d at 1351. Since the plaintiffs' theory of relevance of the 1921 Antidumping Act findings is essentially that it is a prior decision on the same substantive issues, *Coleman* is squarely apposite.

### 2. Confusion of the Issues and Misleading the Jury

▉ Admission of the findings would require a "minitrial" as to their trustworthiness, weight and credibility and as to their correctness under the 1921 Act. This would undoubtedly contribute to confusion of the issues. Moreover, since the findings are at best only marginally relevant, and are based on the specific legal standards of the 1921 Act and the specific adjustments made by Treasury, relating the findings to the issues in this litigation is an inherently confusing task. If the findings were admitted, the defendants would, of course, be entitled to point out to the jury, whether by argument or by bringing in testimony, that the 1921 Act findings were made under the particular standards of that Act.

### 3. Considerations of Undue Delay and Waste of Time

▉ As the defendants have correctly pointed out, if the documents are admitted, defendants would be entitled to raise at trial all the evidentiary matters which support their contention that the documents are not trustworthy. Furthermore, they would be entitled to try to prove that the findings were wrong as a matter of interpretation of the 1921 Act. Finally, they would be entitled to trace the genesis of the findings in order to convince the jury that the documents are, in any event, irrelevant to the legal standards upon which the court would instruct them. These matters would add to the length of the trial, already projected to last a minimum of 12 months, additional time which we conservatively estimate at several months. Any probative value which the documents possess is far outweighed by the undue delay that would ensue from their admission. *See John McShain, Inc. v. Cessna Aircraft Co., supra.*

### 4. Needless Presentation of Cumulative Evidence

▉ Plaintiffs have argued that the documents are relevant to show (1) that defendants' prices in the United States were lower than prices of comparable models in Japan, and (2) that Zenith and NUE were injured by the price differential. The plaintiffs have developed extensive evidence of alleged price differentials between comparable models in the United States and Japan—the evidence they have prepared on this point fills many volumes of appendices to the FPS. Moreover, the plaintiffs also have ample alternative evidence which, in

---

**32.** In *Carter v. Hewitt*, 617 F.2d 961 (3rd Cir. 1980), the Third Circuit discussed the concept of unfair prejudice at some length:

> Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, F.R.Evid. 403. It is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise "may cause a jury to base its decision on something other than the established proposi-

tions in the case." 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03] at 403-15 to 403-17 (1978). A classic example of unfair prejudice is a jury's conclusion, after hearing a recitation of a defendant's prior criminal record, that, since the defendant committed so many other crimes, he must have committed this one too. This is an improper basis of decision, and the law accordingly prohibits introduction of prior convictions to demonstrate a propensity to commit crime. F.R.Evid. 404.

617 F.2d at 972 (footnote omitted).

their contention, shows injury to them. Zenith has submitted detailed damage calculations and has named no less than five Zenith officials who will testify to injury at trial. FPS vol. 19 at 9317. The full list of evidence upon which Zenith relies to prove injury occupies more than 7 pages of the FPS, *id.* at 9317–24, of which only two lines are devoted to a citation of the Tariff Commission Report in the 1921 Act proceeding. Similarly, NUE has submitted detailed damage calculations and has set forth its injury theory at great length, with only minimal reliance on the Tariff Commission findings. FPS vol. 19 at 9325 to vol. 20 at 9686. The documents from the 1921 Act proceeding are at best needlessly cumulative of this other evidence.

In sum, even if we were to conclude that DSS #s 1 through 6 were trustworthy and minimally relevant, we would nevertheless, because of the clear result of the balancing evaluation under F.R.E. 403, be obliged to exclude them at trial.

## IV. Findings Under the Trade Expansion Act of 1962 and the Trade Act of 1974

### A. Introduction; Overview of Trade Act Proceedings

The next group of documents with whose admissibility we are concerned consists of records and reports of proceedings under the Trade Expansion Act of 1962, 19 U.S.C. § 1801, *et seq.*, and its successor statute, the Trade Act of 1974, 19 U.S.C. § 2101, *et seq.*[33] The proceedings are of two general

---

**33.** The documents comprise DSS #s 7 through 24 and are identified as follows:

*DSS # 7*—Report of the U. S. Tariff Commission to the President on Investigation No. TEA 1-21 under § 301(b)(1) of the Trade Expansion Act of 1962, November, 1971 (Escape Clause proceeding). Dates covered: 1961 1970; January–June, 1971. (Television receivers and certain parts thereof).

*DSS # 8*—Report of the U.S. Tariff Commission to the President on Worker Investigation No. TEA-W-77 under § 301(c)(2) of the Trade Expansion Act of 1962. April, 1971. [Emerson Television and Radio Co. (NUE) Jersey City].

*DSS # 9*—Report of the U.S. Tariff Commission to the President on Worker Investigation No. TEA-W-21 under § 301(c)(2) of the 1962 Trade Expansion Act. [F.W. Sickles Division—General Instrument Corp., Chicopee and Ludlow, Mass.] (Electrical components and apparatus and allied products).

*DDS # 10*—Report of the U.S. Tariff Commission to the President on Worker Investigation TEA-W-144 under § 301(c)(2) of the 1962 Trade Expansion Act. [RCA Indianapolis].

*DSS # 11*—Report of the U.S. Tariff Commission to the President on Firm Investigation TEA-F-19 under § 301(c)(1) of the 1962 Trade Expansion Act [Bel-Tronics, Inc., Addison, Ill.] (coils and antennas)

*DSS # 12*—Report of the U.S. Tariff Commission to the President on Worker Investigation TEA-W-70 under § 301(c)(2) of the 1962 Trade Expansion Act [RCA Memphis].

*DSS # 13*—Report of the U.S. International Trade Commission to the President on Investigation No. TA-201-19 under § 201(b) of the Trade Act of 1974. (Escape Clause proceeding) March, 1977 (examines trend of increasing imports from 1968 through 1976). (Television receivers, color and monochrome, as-

sembled or not assembled, finished or not finished, and sub-assemblies thereof.)

*DSS # 14*—Certifications Regarding Eligibility for Worker Adjustment Assistance under § 222 of the Trade Act of 1974—electrical components.

*DSS # 15*—Certifications Regarding Eligibility for Worker Adjustment Assistance under § 222 of the Trade Act of 1974—televisions.

*DSS # 16*—Certifications Regarding Eligibility for Worker Adjustment Assistance under § 222 of the Trade Act of 1974—radios.

*DSS # 17*—Federal Register *Notice* of Worker Adjustment Assistance *proceeding* and *investigation* under 1974 Act re Emerson Radio and Phonograph Corp. Jersey City plant. Certifications of various Zenith plants and refusals to certify for various reasons.

*DSS # 18*—Certifications Regarding Eligibility for Worker Adjustment Assistance under § 222 of the Trade Act—stereos.

*DSS # 19*—U.S. Department of Labor, Bureau of International Labor Affairs Trade Adjustment Assistance System, Report # KG400 RP2. (Computer print out of *all* applications for assistance and actions taken thereon, April, 1975 through July, 1979).

*DSS # 20*—Continuation of 19.

*DSS # 21*—Department of Labor listing of "Workers employed at U.S. establishments engaged in the production of articles covered in the Japanese Consumer Electronics Products Antitrust Litigation and certified for trade adjustment assistance under the Trade Act of 1974" (April, 1975—September, 1979).

*DSS # 22*—Department of Labor, Bureau of International Labor Affairs. Report # KG 404RP1. Listing of firms engaged in production of consumer electronics products, where trade adjustment assistance was sought and granted.

types: (1) so–called "Escape Clause" proceedings (§ 301(b)(1) of the 1962 Act and § 201(b) of the 1974 Act),[34] in which relief in the form, for example, of import quotas or increased duties is sought by a domestic industry from what are perceived to be the injurious effects of imports of like or competing products; and (2) trade adjustment assistance proceedings (§§ 301(c)(1) and (c)(2) of the 1962 Act and §§ 221 and 251(c) of the 1974 Act) in which an individual firm or group of workers seeks relief in such forms as trade readjustment, job search, and relocation allowances to alleviate the injurious effects of increased imports.[35]

The documents at issue here include the records of two escape clause proceedings, one under the 1962 Act (DSS # 7) and one under the 1974 Act (DSS # 13). In addition, the plaintiffs offer documents from several trade adjustment assistance proceedings. DSS #s 8, 9, 10, 11, 12, and 24 relate to proceedings under the 1962 Act; and DSS #s 14, 15, 16, 17, and 18 relate to adjustment proceedings under the 1974 Act. The procedures under the 1962 and 1974 Acts are (with some minor differences not germane to the issues before us) [36] essentially the same.

In an escape clause proceeding under § 301(b)(1) of the 1962 Act, the task of the Tariff Commission is to determine whether (1) as a result in major part of concessions granted under trade agreements, (2) an article is being imported into the United States in such increased quantities, (3) as to cause or threaten to cause serious injury to the domestic industry producing like or competitive articles.

In an escape clause proceeding under § 201(b) of the 1974 Act, the International Trade Commission is charged with determining whether (1) the articles under investigation are being imported in increased quantities, (2) the domestic industry producing like or competitive articles is being seriously injured or threatened with serious injury, and (3) increased imports are a substantial cause of the injury or threat. Trade concessions are no longer a concern, and increased imports need only be a substantial (rather than the major) cause of injury.

Trade adjustment proceedings under §§ 301(c)(1) [firms] and 301(c)(2) [workers] of the 1962 Act are conducted to determine whether trade concession agreements have led to increased imports with resulting injury to a particular firm or group of workers. In trade adjustment assistance proceedings under § 221 of the 1974 Act [workers] and § 251(c) [firms] the Department of Labor and the Department of Commerce respectively must determine whether (1) a significant number of workers in a firm have become separated or threatened with separation, (2) sales and/or production have de-

*DSS # 23*—Department of Labor, Employment and Training Administration. Report ETA 563. "Trade Readjustment Allowance Activities and Employability Services." Listing of payments made by investigation number. No identification of companies or what they produce.
*DSS # 24*—Report of the U.S. Tariff Commission to the President on Firm Investigation No. TEA–F–13 under § 301(c)(1) of the Trade Expansion Act of 1962. (Hi–fi and stereo and related equipment. Trade adjustment sought by H. H. Scott, Inc., Maynard, Mass.).

**34.** These proceedings are termed "escape clause" proceedings because they provide a means by which the United States government can exercise its rights under Article XIX of the General Agreement on Tariffs and Trade to modify or revoke concessions made to other countries in the course of negotiating trade agreements, thereby providing relief to a domestic industry suffering from the effects of increased imports resulting from those concessions.

**35.** There are no firm investigations under § 251(c) of the 1974 Act at issue here.

**36.** For example, under the 1962 Act both escape clause and trade adjustment assistance investigations were conducted by the United States Tariff Commission; under the 1974 Act, escape clause investigations are conducted by the United States International Trade Commission. Firm investigations and worker investigations are conducted by the Department of Commerce and Labor respectively. For purposes of this section of the opinion, we will, from time to time, refer to both the Tariff Commission and its successor, the International Trade Commission, as the "Commission."

clined absolutely, (3) competitive articles are being imported in increased quantities, and (4) increased imports have contributed importantly to the separation and decline in sales and/or production.

## B. The Escape Clause Proceedings in Question

The 1962 Act escape clause investigation was instituted on June 8, 1971, upon petition filed with the Commission by three major unions representing workers in the United States television receiver industry. The petitioners alleged that imports of television receivers had seriously injured the domestic industry and that the 1930 rate of duty (35 percent ad valorem) must be restored to remedy the injury. The 1974 Act investigation was initiated in October, 1976, upon petition from eleven unions and five firms representing or employing workers in the television industry.[37] As required by statute, in each case the Commission gave public notice of the investigations and of hearings to be held. At the hearings interested parties were given the opportunity to be present, offer evidence, and be heard. Counsel for certain defendants in this case appeared at the § 201(b) proceeding. While witnesses were available for cross–examination, they were permitted to refuse to answer questions that called for the disclosure of what the witnesses regarded as confidential business data. In fact, this privilege was invoked numerous times at both proceedings.[38]

Following each of the hearings, the commissioners rendered their decisions, which were based not only on evidence adduced at the hearings but also upon the staff reports prepared following the hearings, which in turn relied upon data and information obtained from various sources including the Commission's own files and those of other governmental agencies. More important from defendants' point of view is the fact that in both proceedings the Commission and staff elicited (and presumably relied upon) information from domestic producers and importers through field investigation and questionnaires. This information was submitted in confidence and has never been disclosed.

At the conclusion of each of the escape clause proceedings, the staff reports, together with the decisions of the Commission, (and the separate concurring and dissenting views of the various commissioners) were sent to the President, along with copies of the transcripts of the hearings and briefs submitted by interested parties. The decisions and the reports were made public, but with the confidential data deleted.

In the 1962 Act (§ 301) proceeding, the results of which were submitted to the President in November, 1971, the Commission made a negative determination–that is, while the Commission found that imports were increasing, it did not agree that such increase was the result in major part of trade concessions.[39] The question of injury

---

**37.** The petition filed under the 1974 Act requested an investigation with respect to imports of color television receivers. The Commission, however, instituted proceedings to determine whether television receivers, color or monochrome, assembled or not assembled, finished or not finished and subassemblies thereof, were being imported in such increased quantities as to cause serious injury to a domestic industry. Thus, the investigation conducted was much broader than the investigation sought by petitioners.

**38.** See n. 24 supra. The Walders affidavit, which as we have noted is uncontroverted, includes excerpts from the transcripts of both escape clause proceedings, in which the "business privilege" was invoked several times.

**39.** The majority view (3 commissioners) was that a number of factors other than trade concessions had brought pressure to bear on the American television receiver industry. Among the factors identified by these commissioners were the dumping of television receivers by Japanese producers, a variety of export incentives provided by the Japanese government and television industry, a rapid increase in Japanese labor productivity and the substantially lower wages there, exchange rates favorable to the yen, and the joint sharing of research and development work and costs by Japanese producers. One commissioner found that trade concessions could not have been the cause of the increase in imports since they had been granted some years before the increase. This commissioner also found that dumping by Japanese producers and the duty–saving provision

to a domestic industry was not reached. In the 1974 Act (§ 201) proceeding which concluded in March, 1977, the Commission found that imports were increasing and that such increased imports were a substantial cause of serious injury or threat of serious injury to the domestic industry producing like or competitive goods.

## C. The Trade Adjustment Assistance Proceedings

The plaintiffs also seek to introduce into evidence a large number of documents relating to proceedings brought under §§ 301(c)(1) and (2) of the 1962 Act and § 221 of the 1974 Act. With the exception of DSS # 8, which relates to an investigation instituted on behalf of Emerson (NUE) workers in Jersey City, New Jersey, and DSS # 17 which relates to proceedings on behalf of NUE and Zenith workers, these documents concern workers or firms in the electronics industry other than plaintiffs.

The procedures governing trade adjustment investigations are essentially the same as those governing escape clause proceedings with one important exception—no hearing is held unless requested by an interested party. In none of the proceedings involving either plaintiff here was a hearing held. Like the investigations under the escape clause provisions, these investigations permit ex parte communications and involve receipt of confidential data.

## D. Statistical Data

In addition to the records made and decisions rendered in escape clause and trade adjustment proceedings, plaintiffs seek to introduce various computer printouts and lists supplied by the Department of Labor (DSS #s 19 through 23). These documents will be described and discussed *infra*.

in the U.S. tariff schedules had contributed to the increase in imports. One commissioner found the "operating environment" of the Japanese television industry to have contributed to the increase. One commissioner found that the

## E. The Hearsay Objection

Like the documents offered from the 1921 Act proceedings, the materials described above constitute hearsay. Defendants object to their admission, which is sought under the 803(8)(C) exception, on the grounds that they do not constitute findings within the meaning of the rule and are not trustworthy.

### 1. The Escape Clause Proceedings

#### a. Did the Commission Make 803(8)(C) Findings

■ The investigations conducted under § 301(b)(1) of the 1962 Trade Expansion Act and § 201(b) of the 1974 Trade Act produced what we term formal or ultimate findings by the Commission: in the former case that the statutory criteria for relief had not been met—in essence a negative finding (although all commissioners agreed that imports were increasing), *see* n. 39 *supra* ; and in the latter case a finding that the U.S. industry producing color and monochrome television receivers, assembled or unassembled, finished or unfinished, and subassemblies thereof was being seriously injured or threatened with serious injury and that increased imports were a substantial cause of that injury or threat. These are findings within the meaning of 803(8)(C).

In addition to these "ultimate" findings, plaintiffs seek to introduce as findings various excerpts from the opinions of individual commissioners in each proceeding. In our view, these opinions do not constitute "findings" within the meaning of Rule 803(8)(C) and may not be introduced under that exception, even though the commissioner's individual remarks quite literally constitute conclusions made by officers of a public agency following an investigation. Each commissioner was provided with the same data; the conclusions they reached individually, however, range from slightly divergent to completely at odds.[40] Even in the

statutory criteria had been satisfied and that relief should have been granted.

**40.** Although in both proceedings there are factual conclusions that are agreed upon by some or all of the commissioners, plaintiffs have in-

---

201(b) proceeding under the 1974 Act, where the commissioners were unanimous in their finding that increased imports had caused injury to a U.S. industry, they did not agree on the definition of the affected industry (the majority found injury to producers of "color and monochrome receivers, assembled or unassembled, finished or unfinished, and subassemblies thereof"; the concurring members found injury only as to color television receivers, and differed among themselves as to the further definitions (assembled v. unassembled, finished v. unfinished, etc.). To give the individual opinions to the jury and let its members decide which are correct and which are not would be to permit the purest speculation, for the jury members would be considering the opinions in a vacuum. The process would be similar to that required when a jury must decide which of two experts in a personal injury case is the correct one, but here the fact–finder would not have the benefit of information elicited on cross examination.

Were these opinions to be admitted, it would be essential that the staff reports be admitted as well, so that the jury could review the data and conclusions upon which the opinions were based. However, even though the staff reports set forth a multitude of declarative sentences stated as fact and may thus be said to include "findings," we have already concluded that only the staff findings that are adopted by the public agency are admissible under 803(8)(C). See p. 1145 *supra*. In addition, the staff reports present problems in terms of trustworthiness.

sisted upon offering the entire records of these investigations, including the dissenting views. While we could no doubt ferret out the areas of agreement and term them findings within what we perceive to be the meaning of 803(8)(C), we are somewhat reluctant to undertake what would be a lengthy exercise in light of our conclusions regarding the trustworthiness of these proceedings.

41. In this connection, it is worth noting, however, the remark of one of plaintiffs' expert witnesses, Stanley Nehmer, in an address delivered to the symposium "Understanding What's 'Fair' and 'Unfair' in International Trade," in March, 1979: "In agencies which exercise a

### b. *Trustworthiness*

In determining whether these reports and the findings contained therein are trustworthy within the meaning of Rule 803(8)(C), we have considered in addition to the factors identified by the Advisory Committee as bearing upon the question, certain of the factors we have described *supra* that seem to us to have relevance to a trustworthiness determination. We note that defendants have not contended that the investigations were untimely, and indeed the statutory mechanism governing an escape clause proceeding requires that a decision be rendered within six months after the petition seeking relief is filed. We note further that a hearing was held in each of the escape clause proceedings at issue here again as required by statute. The agency conducting the investigations (the Tariff Commission and International Trade Commission respectively) has expertise in the areas of imports and foreign trade, and there has been no suggestion that the commissioners or their staffs were not acting impartially in discharging their duties.[41] Other factors that we have identified have given us some pause, however, and have led us to conclude that these reports and findings are not trustworthy for purposes of this lawsuit.

Of major importance to this conclusion is the extent to which these findings are based upon or are the product of proceedings pervaded by the receipt of substantial amounts of material that would not be admissible in evidence. (Criterion # 2, *su-*

considerable influence on U.S. trade policy, such as the State Department and the Treasury Department, the prevailing view all too often is that trade issues must be subordinated to larger U.S. foreign policy objectives." This statement suggests that governmental agencies, however objective we might presume them to be in discharging their various tasks, must nonetheless be aware of and responsive to the large policy concerns that must necessarily inform the conduct of a world power. The escape clause findings may thus be subject to a trustworthiness attack under our criterion # 5. See discussion *infra* at 1167.

*pra* ). As noted above, in conducting an escape clause investigation, the Commission relies not only upon evidence adduced at the hearings (which themselves permit the admission of hearsay) but also upon confidential data supplied by domestic producers either in response to questionnaires or in interviews. There are three serious problems raised by this procedure. First, the data and information submitted in confidence is not made a part of the public record so that its accuracy and trustworthiness has never been and can never be explored. Second, this data is critical to a determination by the Commission, relating as it does to such matters as domestic production figures and prices, yet, since it is submitted in confidence and is deleted from the public record, there is no way to determine the extent to which it was relied upon by the Commission in rendering its decision or by the staff in preparing its report. Since the record is incomplete (*see* criterion # 4), the reasonableness of the ultimate findings by the Commission or of the views of individual commissioners cannot be ascertained. Third, while the Commission and its staff do manage to qualify as disinterested investigators, *but see* p. 1167 *infra*, many of the suppliers of the confidential information do not, since they were domestic producers for whose benefit the escape clause proceedings were initiated. Because they had a stake in the outcome of the proceedings and knew that the information they supplied was confidential, we feel less inclined to assume the data they supplied was complete and correct than we otherwise might be.

The consideration of such confidential data as is described above implicates the validity of the agency's expression of expertise as well. (Criterion # 7, *supra*). To the extent that the Commission was functioning as an expert, the provisions of the rules of evidence governing the receipt of expert opinion are useful in analyzing the trustworthiness question here. Even assuming that the confidential facts and data employed by the Commission were of a type reasonably relied on by experts in the particular field (Rule 703) and, therefore, that

they need not themselves be admissible into evidence, Rule 705 provides that the expert may be required to disclose the underlying facts or data on cross examination. Here, not only are the commissioners not available for cross examination, but the trustworthiness of the underlying data can in no other way be explored since the data itself is confidential.

In addition to the fact that the Commission received and considered confidential data, it is clear that other hearsay was the basis of many of the "factual" or declarative statements made in the staff reports and in the opinions of the individual commissioners. The sources of those declarative statements are rarely disclosed. In many instances where they are disclosed, it is clear that the sources are or may be unreliable, *e. g.*, Fairchild News Service, *T.V. Digest*, Report of U.S. Embassy in Tokyo. Moreover, in the escape clause proceeding conducted under the 1962 Act, the staff and the individual commissioners relied in great part on the dumping proceedings discussed *supra*. Indeed, it appears that the Commission's inability to decide that imports were increasing as a result in major part of trade concessions rests largely on the dumping determinations, which we have found to be both untrustworthy and irrelevant to these proceedings. Since we have concluded that the 1921 Act materials cannot be admitted in their own right, the conclusion that they cannot be admitted as part of the record of another proceeding is inescapable. (Criterion # 6, *supra* ).

Finally, we note that the findings made in the escape clause proceedings were made in the context of a protectionist statute, which reflects purposes and policies different from those reflected in the antitrust laws and at least potentially at odds with them, since protectionism shelters U.S. industry from competition, fair or not. Because there appear to be policy as well as investigative and adjudicative considerations involved in these proceedings, *see* n. 41 *supra*, it is our view that the findings are at least in part a function of those policy considerations, which underlie the statutes

defining the charter of an escape clause investigation, and in this sense the findings may not be trustworthy for purposes of an antitrust proceeding (criterion # 5 *supra*), though the fact that the issues before the Tariff Commission differed from those before us also bears, and perhaps more directly, on the question of relevance.

In sum, we conclude that the findings made in the escape clause proceedings, even if construed broadly to include statements of fact made by individual commissioners and their staffs, must be excluded as untrustworthy. This conclusion stems largely from the fact that the proceedings are pervaded by the receipt and consideration of confidential data, the validity of which has never been and can never be explored or tested. What is before us is an incomplete record with salient information deleted. In addition, we are troubled by the Commission's apparent use of other unreliable hearsay and by the extent to which the 1921 Dumping Act findings infiltrate the record of the § 301(b) proceeding. These considerations coupled with the fact that the escape clause investigations were conducted under statutes whose aims and purposes are different from those of the antitrust laws, force us to conclude that the records of the escape clause proceedings are not trustworthy for purposes of this action.

**2. The Trade Adjustment Assistance Proceedings**

We also have before us the results of trade adjustment assistance proceedings conducted under both the 1962 and the 1974 Acts. The proceedings under the 1962 Act produced records similar to those produced in the escape clause proceedings, consisting of: (1) a determination by the Commission of whether the statutory requirements for relief had been met, *i. e.*, whether as a result in major part of trade concessions, articles were being imported in such increased quantities as to cause or threaten to cause serious unemployment or underem-

ployment to workers in a domestic industry (§ 301(c)(2)) or to a firm (§ 301(c)(1)); (2) the views of the individual commissioners; and (3) the staff reports. The documents submitted in connection with proceedings under the 1974 Act consist only of the determination by the Secretary of Labor that the statutory criteria for eligibility for relief had or had not been met and a summary of the reasons for so concluding. We deal with the proceedings under each of the Acts separately, since they raise somewhat different problems as to whether they contain findings, what the findings consist of, and whether they are trustworthy.

**a. Were 803(8)(C) Findings Made**

■ The 1962 Act proceedings at issue here comprise DSS #s 8, 9, 10, 11, 12 and 24 and include both worker and firm investigations. In all but one of the investigations, the Commission could not agree upon a result, the commissioners being equally divided as to whether the statutory criteria had been met, so that the reports issued to the President contained no formal or ultimate findings under §§ 301(c)(1) or (c)(2) and concomitantly no recommendations.[42] In Worker Investigation No. TEA–W–144 (DSS # 10), which was instituted by a petition filed on behalf of workers at the RCA Corporation plant at Indianapolis, Indiana, the Commission unanimously found that articles like or directly competitive with unrecorded magnetic tape were not as a result in major part of trade concessions being imported in such increased quantities as to cause or threaten unemployment or underemployment of a significant number of workers. As to other products manufactured at the plant (television yokes, tuners and horizontal output transformers), the Commission was equally divided and made no finding.

■ Thus, in all but one of these proceedings, there are no formal findings at

---

**42.** Although there is nothing in the record to indicate what action, if any, the President took upon receiving these reports, plaintiffs have represented to us that in each case where the Commission split, the President granted relief. We do not believe such action converts a non-finding into a finding.

all. Furthermore, for the reasons set forth above, we conclude that the views of the individual commissioners and the statements of fact in the staff reports cannot be termed 803(8)(C) "findings."

 Worker trade adjustment assistance proceedings brought under the 1974 Act are the subject of DSS #s 14, 15, 16, 17, and 18. With the exception of DSS # 17, which relates specifically to proceedings on behalf of NUE workers in Jersey City and Zenith workers at various locations across the country, each DSS contains the results of several individual worker adjustment investigations in a particular industry, e. g., stereos, televisions, all as summarized in the Federal Register "Notices of Certification Regarding Eligibility to Apply for Worker Adjustment Assistance." Each summary offered here (except for those in DSS # 17 discussed infra) contains an affirmative finding–that a significant number of workers at a particular firm or subdivision thereof have become totally or partially separated (or are threatened with total or partial separation); that sales or production or both of such firm have decreased absolutely; and that increased imports of like or competitive products contributed importantly to such separation, or threat, and to such decline in sales and/or production. In addition, each summary contains what may be termed subsidiary findings, that is, declarative statements containing statistical data supporting the various ultimate findings of increased imports, declines in production, etc.[43] Because the findings are those of a single employee of the Department of Labor, these summaries do not present the conflicting views and conclusions that characterized proceedings conducted by the Tariff Commission.

Unlike the other groups of documents relating to trade adjustment proceedings under the 1974 Act, DSS # 17 contains both certifications and denials of certification of eligibility for worker assistance. These documents relate specifically to workers employed by plaintiffs. The only

document offered that relates to NUE workers is a Federal Register notice that a proceeding has been instituted on behalf of workers at Emerson's Jersey City plant. This notice does not, of course, constitute a finding.

Plaintiffs have also offered Federal Register summaries of nine proceedings on behalf of Zenith workers at various plants throughout the United States. Of these, five resulted in a negative determination, i. e., that the statutory criteria for relief had not been met. In addition to such "ultimate findings," these summaries include subsidiary findings in the form of discussions of the reasons why a particular requirement is deemed not to have been fulfilled (e. g., sales or production have not declined absolutely). There is a disclaimer of any findings as to the other criteria.

In three Zenith investigations, the petitioning workers were certified as eligible to apply for relief. These proceedings thus contain the ultimate finding that each of the statutory requirements has been fulfilled, as well as subsidiary statistical findings in support of these conclusions. One investigation resulted in a negative determination as to workers in a certain division of two different Zenith plants and a positive determination as to workers in other divisions of these plants.

We conclude that the ultimate and subsidiary findings contained in these summaries of worker adjustment proceedings under the 1974 Act qualify as findings within the meaning of 803(8)(C).

b. *Trustworthiness*

 The documents offered from the trade adjustment assistance proceedings present problems of trustworthiness like those we found in analyzing the escape clause proceedings. All of these investigations, whether conducted by the Tariff Commission under the 1962 Act or the Department of Labor under the 1974 Act, are pervaded by confidential and hearsay data

---

**43.** These "subsidiary findings" are essentially equivalent to the statements in the staff reports

submitted in connection with worker and firm investigations under the 1962 Act.

elicited from parties with a stake in the outcome. The records submitted from the 1962 Act proceedings contain large gaps where confidential (and critical) material was deleted. The documents submitted from the 1974 Act proceedings are summaries only and contain no citations to sources. Moreover, in none of these proceedings was a hearing required and in the great majority of them no hearing was held. Finally, we note the task before the various agencies in these investigations was defined and limited by the scope of trade acts whose purposes are protectionist, and thus the issues considered diverge sharply from those before us, and have policy overtones.

For all the foregoing reasons, we do not believe that conclusions in the trade adjustment assistance proceedings can be deemed trustworthy for purposes of this case.

## F. The Relevancy Objection

### 1. The Escape Clause Proceedings

■ Even if deemed trustworthy, the findings made by the Tariff and International Trade Commissions in their respective investigations are not relevant to the issues in this case for the following reasons.[44]

First, the finding of the Tariff Commission in the 1962 Act proceeding was essentially a negative finding and could be offered to prove no more than that trade concessions did not contribute to an increase in imports which in turn threatened or caused serious injury to a domestic industry, a fact that bears no relationship to any of the issues before us in this antitrust action.

Second, the finding of injury to the domestic industry producing television receivers in the 1974 Act escape clause proceeding was an industry–wide finding that considered imports from all sources and did not specifically or necessarily include a finding of injury to these plaintiffs[45] or imports from these defendants. As we have noted, *supra* at 1157–1158, the fact that an industry as a whole is found to have suffered injury or that export activity world–wide is found to have been a substantial cause of that injury does not provide logical support for the conclusion that any particular domestic firm has been injured or that imports from any particular country or foreign producer have been the cause of that injury. Even more attenuated is plaintiffs' argument that the industry–wide injury determination can support a finding of a causal connection between the putative anticompetitive acts of these defendants and the injury these plaintiffs are said to have suffered, for not only are these parties not identified in the escape clause findings, but the means by which the increase in imports had been effected was not considered or discussed by the Commission. Thus, the injury could as easily have resulted from fair as from unfair competition.[46] The inference that the injury resulted from antitrust violations simply cannot be drawn from these materials.

Similarly, though plaintiffs have argued to the contrary, the escape clause findings are not relevant as proof of intent to affect United States commerce and of actual effect on that commerce for purposes of subject matter jurisdiction,[47] or as proof of predatory intent and anticompetitive ef-

**44.** We make no rulings as to the admissibility of these documents in connection with the defendants' "sham litigation" counterclaim. *See* discussion *supra* at 1139.

**45.** In making its determinations with respect to injury, the Commission must consider "the inability of a significant number of firms to operate at a reasonable level of profit." 19 U.S.C. § 2251(b)(2). The Commission's report states that in 1976 the domestic television receiver industry comprised twelve firms. A finding of injury to that industry is thus a finding of injury to a significant number of firms, but not

necessarily to all of them. In any event, the injured firms are not identified.

**46.** The Commission specifically declined to make any findings regarding the antitrust violations at issue in this litigation.

**47.** *See* Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), *Zenith Radio Corp., et al. v. Matsushita Electric Industrial Co., Ltd., et al.*, 494 F.Supp. 1161 (E.D.Pa. 1980).

fects for purposes of the substantive violations alleged here. As we have observed, a finding that imports from all sources have injured a domestic industry does not logically support the inference that imports from these defendants have had that effect or that these defendants intended that effect. We note further that even if we were to assume that some inferences could be drawn about these parties from the documents at issue here, those inferences are not nearly so sweeping as plaintiffs would claim.

■ Seizing upon the legal maxim that a party is deemed to intend the natural and probable consequences of his acts[48] (rescribed in our opinion on subject matter jurisdiction, *supra*, n. 66), plaintiffs posit that defendants' anticompetitive intent can be inferred from the finding of injury. This argument ignores that such an inference could be drawn only if plaintiffs also produced proof of anticompetitive acts. Intent cannot be inferred from consequences (effects) alone. The escape clause proceedings do not implicate any conduct other than the act of exporting.[49] In fact, as we have noted *supra* n. 46, in the § 201 proceeding the Commission specifically made no findings regarding the antitrust issues in this litigation.

For all of the above reasons, we have concluded that the escape clause proceedings are not relevant in the litigation before us.

2. *Trade Adjustment Assistance Proceedings*

■ As we earlier observed, the trade adjustment assistance proceedings conducted under the 1962 Act in all cases but one resulted in a split of opinion among the commissioners and, therefore, in no formal findings. Even if we were to glean proper 803(8)(C) findings from these records, however, we would nevertheless be moved to exclude them on grounds of relevancy, since they do not tend to make more or less probable the existence of any fact of consequence to the determination of the action. F.R.E. 401. Like the escape clause proceedings, these investigations considered imports from all sources, not just from Japan or from these defendants. Furthermore, only one of these investigations involved a plaintiff in this lawsuit (DSS # 8-Emerson [NUE] workers). The probative value here of a nonfinding as to nonplaintiffs is nil. The Emerson proceeding is of no probative value since it is one of the split decisions and, again, involved imports from all sources.

■ Similarly, we have concluded that the trade adjustment assistance investigations under the 1974 Act that relate to workers at plants other than those of plaintiffs must be excluded as irrelevant to this proceeding. In addition to bearing not at all on any injury these plaintiffs might have suffered, they relate to imports from all sources and consider an injury that could have resulted from fair competition. Thus they do not advance the proof of injury to competition required by the antitrust laws or of injury to these plaintiffs, required in a private treble damage action. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

■ As to the nine proceedings involving Zenith workers, we find that they suffer from some of the same relevancy problems as the other trade adjustment assistance investigations and from some additional problems of their own.

---

**48.** In a criminal proceeding, the jury may not be instructed that the law *presumes* that a party intends the natural and probable consequences of his voluntary acts, though the jury *may infer* that a person so intends. *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Whether this standard would apply in a civil action is doubtful, but in neither the criminal nor civil context could the acts themselves be presumed or inferred from proof of the consequences or effects alone.

**49.** Of course, the report of the § 301(b) proceeding refers at some length to the 1921 Act dumping investigations the results of which we have previously concluded are inadmissible in their own right. See Part III *supra*.

First, as we have already noted, in five of the proceedings, the only findings were negative findings–that the statutory criteria for relief had not been met. The discussion of which criterion had not been fulfilled, *e. g.*, production had not declined or increased imports did not contribute importantly to layoffs, is in each case wholly unrelated to any allegation Zenith would seek to prove in this case. In the proceedings in which affirmative determinations were made, those determinations were based on a consideration of imports from all sources and include a finding of injury from competition that may or may not have been unfair. Furthermore, as defendants have pointed out, the injury found is injury to Zenith *workers*, not to Zenith, who is, after all, the plaintiff here. In fact, in two instances Zenith's own imports from Taiwan and Mexico were specifically cited as contributing to the increase in imports that led to the injury. Under these circumstances, we conclude that these injury determinations are not relevant to this proceeding.

## G. *Exclusion of Evidence Under Rule 403*

The Rule 403 considerations that informed our discussion of the Antidumping Act materials are equally relevant here, and so we need but summarize them as applied in the present context. For purposes of analysis we must and do assume that the proffered materials pass the minimal relevancy threshold of Rule 401.

▮ Even given this assumption, however, we conclude that the probative value of the results of the escape clause and trade adjustment assistance proceedings is very low and is far outweighed by the unfair prejudice of introducing findings by governmental agencies that domestic industries, workers, and firms have been injured as a result of increased imports. *Cf., Coleman Motor v. Chrysler Corp.*, 525 F.2d 1338 (3rd Cir. 1975) (error to admit prior jury verdict that defendant had committed antitrust violation). Furthermore, there is the added danger of misleading the jury into thinking that the injury found by the International Trade Commission and the Department of Labor is coterminous with the injury that must be shown in an antitrust case.

Just as we noted in our discussion of the Antidumping Act materials, if these documents are admitted, defendants would be entitled to launch an attack on both their trustworthiness and their probative value—a process that could potentially entail exploring each of the trade adjustment and escape clause proceedings and the significance of the evidence upon which the determinations were based. Given what we have deemed to be at best the limited probative value of these documents, and given the prospect of enormous delay, waste of time, and confusion of the issues such a process would inevitably entail, we can conceive of no circumstances under which we would admit the proffered proceedings at trial.

Finally, we note that these documents are needlessly cumulative of other evidence on the issue of injury to these plaintiffs and to competition in general. *See* discussion *supra* at 1184.

## H. *Miscellaneous Documents*

▮ In addition to the documents discussed at length above, plaintiffs have submitted in DSS #s 19 through 23 lists of various kinds supplied by the Department of Labor that provide summaries of activities of that agency in connection with its involvement in trade adjustment assistance proceedings. These data compilations are more properly characterized as 803(8)(A) or perhaps 803(8)(B) materials than as 803(8)(C) documents.

DSS #s 19 and 20 are made up of a computer print-out that lists *all* applications for adjustment assistance and actions taken thereon, filed with the Department of Labor from April 4, 1975, through July 31, 1979. While we have no doubt that this list provides an accurate survey of Department of Labor activities and therefore may be deemed trustworthy as proof that the petitions and actions listed therein were in fact filed and did in fact occur, we question its relevance since it contains applications from workers in all kinds of domestic industries (*e. g.*, shoes, clothing). To the extent that

it includes worker applications relating to products at issue in this case, it would appear to be cumulative in light of DSS #s 21 and 22 which list firms producing consumer electronics products whose workers applied for and were certified as eligible to receive trade adjustment assistance benefits under the 1974 Act. The problem with DSS #s 21 and 22 is that the data compilations merely reflect the results of the § 221 proceedings described above and the actions taken in connection therewith, so to the extent that the results of the proceedings are either untrustworthy or irrelevant to issues here, so too would be any substantive inferences that might be drawn from the reports, although as noted, the reports themselves may accurately reflect the actions taken by the Department of Labor.

DSS # 23 is a Department of Labor report summarizing trade readjustment allowance activities and employability services. The data is compiled geographically and then subdivided by investigation number. There is no way to determine what industry each investigation relates to, though if this list were matched with others, identifying both the firm and the investigation number, it would be possible to do so. Standing alone, the list is useless. Like the other listings submitted here, this document can be deemed to accurately reflect only the data recorded and could not in any event be used for substantive proof of any issue here. Thus the miscellaneous documents are inadmissible.

## V. The Records and Findings of the Japanese Fair Trade Commission (JFTC)

### A. Nature of the Proceedings Before the JFTC

DSS #s 25 and 26 pertain to proceedings before the Japanese Fair Trade Commission (JFTC). In order to understand the nature of those documents, a description of the Law Concerning the Prohibition of Private Monopoly and the Maintenance of Fair Trade, Act No. 54 of 1947 (the "Anti–Monopoly Law"), which is enforced by the JFTC, is necessary. Our information is gleaned from numerous affidavits filed by expert witnesses from both sides, as well as from the testimony of plaintiffs' expert, Professor John Owen Haley of the University of Washington Law School, and from our independent reading of the Japanese Anti–Monopoly Law and the regulations promulgated thereunder.[50]

---

**50.** Professor Haley specializes in Japanese law, teaching courses on the Japanese legal system, U.S.-Japanese contract and sales problems, Japanese administrative law, and Japanese business relations in Japan, which includes work in Japanese antitrust law. He speaks and writes Japanese, and was for over two years employed in Japanese law offices in Osaka and Tokyo. He is editor of the principal English language periodical on Japanese law, and is a member of various committees and organizations related to Japanese and East Asian law.

Professor Haley submitted a series of affidavits, two of which, those of February 1, 1979 and May 27, 1980, are relevant to the Japanese Fair Trade Commission issues. Additionally, Professor Haley testified before us on June 24, 1980. We have also considered a number of affidavits submitted by experts on behalf of defendants, principally those of Professor Mitsuo Matsushita, signed on March 25, 1980 and June 10, 1980, and those of Dr. Michigo Ariga, signed April 17, 1979, June 15, 1980, and June 16, 1980.

Professor Matsushita is Associate Professor of Law at Sophia University, Tokyo, Japan, where he teaches Japanese antimonopoly law. He is fluent in English, and has lectured as a visiting professor on Japanese antimonopoly law at American law schools. He is the author of over 100 articles in both Japanese and English, as well as numerous books, dealing with Japanese antimonopoly law. He has been appointed to several task forces created by the JFTC to study various antimonopoly law problems, and is at present a member of two such task forces studying Japanese antimonopoly law and international trade. He has no family relationship to any present or former employee, officer, or principal of any of the Matsushita defendants in this litigation.

Dr. Ariga is advisor to the law firm of Shimoda and Sakamoto in Tokyo and serves as the Head Representative of the Japanese government at plenary meetings of the Transnational Corporation Committee of the United Nations. She is proficient in both written and spoken English, has taught courses in Japanese antimonopoly law both in Japan and in the United States, and has written articles in both Japanese and English on the Japanese Anti–Monopoly Law. She served with the Japanese Fair Trade Commission for approximately twenty–five years in various capacities, culminated by five years as a Commissioner.

**1174**

The Japanese Anti–Monopoly Law is similar in purpose to the U.S. antitrust laws. As described in Sec. 1,

> This Act, by prohibiting private monopolization, unreasonable restraint of trade and unfair business practices, by preventing the excessive concentration of economic power and by eliminating unreasonable restraint on production, sale, price, technology, and the like, and all other undue restrictions of business activities through combination, agreements, etc., aims to promote free and fair competition, to stimulate the initiative of entrepreneurs, to encourage business activities of enterprises, to heighten the level of employment and peoples' real income, and thereby to promote the democratic and wholesome development of the national economy as well as to insure the interests of consumers in general.

The Anti–Monopoly Law includes among its provisions a prohibition against private monopolization and unreasonable restraints of trade (§ 3); a prohibition against unfair methods of competition (§ 19); a prohibition against undue disparity of economic power (§ 8); a prohibition against the formation of holding companies (§ 9); and a prohibition against certain interlocking directorships (§ 13).

The JFTC, similar to our Federal Trade Commission, was established by the Anti–Monopoly Law in order to effectuate the Act's purposes. While private actions are cognizable under Japanese law, they are extremely rare[51] and, for practical purposes, the JFTC is the sole enforcement mechanism of Japanese antitrust law.

The JFTC is an independent governmental agency, composed of a Chairman and four Commissioners, appointed by the Prime Minister, with the consent of both houses of the Diet. The staff of the JFTC, which is broken down into an economic division, a trade practices division, and an investigation division, includes trial examiners selected from staff office personnel, "whose duty it [is] to handle the proceedings," but who are expressly denied the authority to render any actual decision. Anti–Monopoly Law, Art. 35.

Under the Anti–Monopoly Act and the JFTC's "Regulation Concerning Investigation and Hearing by the Fair Trade Commission, Fair Trade Commission Regulation No. 5, Oct. 19, 1953, as amended ("Regulations"), JFTC proceedings comprise two principal stages. The first, or investigative, stage culminates in the initiation of a formal action. Under Sec. 45 of the Act and Art. 9 of the Regulations, an investigation conducted by members of the Commission staff may commence either upon the request of an outside party or by the Commission on its own authority. During this preliminary investigation, the staff can move from a highly unstructured initial screening process to a slightly less informal one by invoking certain legal processes to obtain information, including compulsory process, spot inspections, the interrogation of witnesses, the taking of statements, and the use of expert testimony. While the Act provides for notice to be forwarded to a suspected violator and while a respondent

There are a number of instances in which the views of Professor Haley conflict with those of Drs. Matsushita and Ariga. In these instances we have followed the views of Drs. Matsushita and Ariga, believing these individuals to have greater understanding of the Japanese Antimonopoly Law and JFTC procedures. While we have a high regard for Prof. Haley, because he lacked actual knowledge of the workings of the JFTC, we found his views to be less persuasive than those of Drs. Matsushita and Ariga. Prof. Haley did not contradict any factual statements made in the affidavits of Drs. Matsushita and Ariga, admitting they were "essentially correct" and stating that the "rumors of disagreement between us are greatly exaggerated."

Pretrial Order No. 264 at 269. Instead, the differences are in the experts' respective conclusions and characterizations; it is in this area that the personal knowledge of Drs. Matsushita and Ariga becomes vital. It should be noted that such judgments are plainly within the province of the court as proof of foreign law. See Fed.R.Civ.P. 44.1.

51. According to Dr. Ariga, there have been only two private suits for damages under the Japanese Anti–Monopoly Act since its adoption in 1947. While others have suggested that there may have been four or five such suits, it is clear that whatever the actual number, such suits are unusual.

can object to a demand for certain information upon an appropriate motion, for the most part the rights accorded a respondent during the investigation stage are limited. There is, for example, no right to cross examination.

At the close of the investigation, a staff report, setting forth the "incipiency" of the violation, the investigative process, a synopsis of the facts of the case, applicable legal provisions, and the opinion of the investigator is transmitted to the Commission. *Regulations*, Art. 18(2). If the Commission deems a violation to be likely, it issues a "Recommendation" to the respondent. Such a Recommendation includes facts and application of the law, as well as measures to be taken to eliminate the violation. As described in the affidavit of Dr. Ariga, *see* note 50, *supra*, the facts set forth in the Recommendation are those which had been set forth in the staff report, and the Commission relies upon that report rather than inquire into the evidence at that preliminary stage. The purpose of the factual recitation is to preclude initiation in the future of any proceedings based upon the same facts, and to provide a context within which the respondent is to take measures to eliminate the suspected violation.

The respondent may either accept or reject the Recommendation. If the Recommendation is accepted, the Commission issues a "Recommendation Decision" without resorting to a hearing. According to the affidavits of both Drs. Matsushita, *see* note 50, *supra*, and Ariga, the description of the alleged violation as outlined in the Recommendation Decision is identical to that of the original Recommendation, as required by Sec. 48(4) of the Anti–Monopoly Law. The purpose of this system is to obtain early settlement of disputes.

Should the respondent reject the Commission's recommendation, the Commission serves a Complaint upon the respondent, thus initiating the second, or hearing, stage of the JFTC's investigative proceedings. This Complaint sets forth the suggested violation in a manner identical to that of the previously issued Recommendation. At

this point, the Commission may appoint a hearing examiner to conduct formal hearings. Unlike the preliminary investigation phase, the respondent is now afforded many legal rights such as counsel, cross–examination, and the presentation of a defense.

At any time after the Complaint is served, but before the Commission renders a final decision, the respondent may agree to entry of a "Consent Decision" by submitting

> to the Fair Trade Commission a written statement setting forth that he admits the findings of fact and the application of law in the said complaint, and that he will rather accept a decision without resorting to the subsequent proceedings and [filing] therewith a plan regarding concrete measures to be taken by him in order to eliminate such violation.

Japanese Anti–Monopoly Act, § 53–3. Further proceedings are then aborted, and the Commission enters a Consent Decision. We credit the affidavit testimony of Drs. Matsushita and Ariga to the effect that no negotiation is permitted at this juncture. As with the Recommendation Decision, if a respondent wishes to end the proceedings, he is faced with a "take it or leave it" proposition. Section 53–3, quoted above, requires respondent to admit the allegations of the Complaint and does not permit modification. In fact, in Mrs. Ariga's lengthy experience with the Commission, each Consent Decision has repeated *verbatim* the allegations of the Complaint, and does not take into consideration any evidence adduced during hearings which may have been held in the interim. As with the Recommendation Decision, the purpose of this requirement is to expedite resolution of the matter.

If no Consent Decision has been entered, the examiner, following the conclusion of the hearings, submits a report, together with the entire record of the case, to the full Commission. This report, which defendants translate as "Draft of Decision," but which plaintiffs translate as "Initial Decision," contains a statement of the facts, evidence, application of the law, and a pro-

posed order. Subsequently, the full Commission reviews the document and, after consideration of the entire record, issues its Decision in the proceedings. The Commission may issue a decision identical to the examiner's report, remand the case to the examiners, initiate its own hearings, or decide to terminate the proceedings.

It should be noted again that the hearing examiner has no authority to issue a decision that is legally binding upon the respondents. Under Sec. 35(2) of the Anti–Monopoly Act, the hearing examiner is expressly precluded from issuing a decision. He does have authority under the accompanying Regulations to submit to the Commission a report of the hearings in the form of a draft of decision, or initial decision, providing the Commission with materials for its consideration in its ultimate decision–making role. The Commission may not rely upon the judgment of the hearing examiner in rendering its decision; rather it must, pursuant to Article 69 of the Regulations under the Act, examine the entire record itself, including all testimony and evidence taken. The Commission then renders its Formal Decision, stating findings of fact and application of the law.

In summary, there are three types of decisions which the Commission may make: a Recommendation Decision based upon the initial informal investigative report; a Consent Decision, based upon the allegations of the Complaint which is in turn based upon the Recommendation; and a Formal Decision following hearings and submission of a report by the Hearing Examiner. Alternatively, the Commission may issue an Order to Terminate the proceedings.

## B. *The JFTC Documents at Issue*

We have before us documents pertaining to two separate cases before the JFTC.[52] For the sake of clarity, we will discuss these cases in chronological order, which will allow us to discuss the simpler case first,

although plaintiffs have reversed that order in their document submissions.

## 1. *The Market Stabilization Case*

In DSS 26, plaintiffs seek to introduce a single document: a Recommendation Decision entered into in JFTC Case No. 5 of 1957, which was brought against the Home Electric Appliance Market Stabilization Council, six of whose members are defendants in this action, *see* n. 5, *supra*, and the National Federation of the Associations of Radio and Electric Appliance Dealers (NFA). The Council was an industry–wide group formed, in plaintiffs' submission, to "stabilize" the domestic market in consumer electronic products by setting and maintaining artifically high prices and by policing the agreements reached by its members. On September 30, 1957, presumably after a preliminary informal investigation, the JFTC served a Recommendation upon the Council and the NFA alleging various violations of the Anti–Monopoly Act and proposing a cease and desist order.

The Council and the NFA decided to accept the Recommendation. Accordingly, only two and one–half weeks after issuance of the Recommendation, on October 17, 1957, a Recommendation Decision was issued. As indicated *supra*, the Recommendation Decision was identical to the Recommendation. It is the Recommendation Decision which plaintiffs seek to introduce in DSS 26. The record contains no information as to the actual investigative steps taken, *i. e.*, what if any of the measures available to the investigators were in fact used. Professor Haley agreed that there was no mandate under the JFTC statute or regulations which required any particular steps to be taken in any particular case. See n. 62, *infra*.

## 2. *The Matsushita Resale Price Maintenance Case*

DSS 25 consists of a series of documents related to JFTC Case No. 4 of 1967, brought

---

**52.** Documents pertaining to a third JFTC case, the so–called "Six Company Case," *see* p. 1138, *supra*, have also been tendered for admission in this proceeding. While some documents originally offered, such as the "Draft of Decision" (or "Initial Decision"), have since been withdrawn by the plaintiffs, others, primarily notes of testimony and protocols, *see* p. 1138, *supra*, remain in the case and will be considered in a subsequent opinion.

against Matsushita Electric Industrial Co., Ltd. (MEI) charging certain resale price maintenance practices directed towards MEI's Japanese wholesalers. Plaintiffs contend that MEI's supposed resale price maintenance activities were an implementation by that company of all defendants' conspiracy to stabilize the Japanese domestic market at artificially high prices, one of twin foci of plaintiffs' theory of the case. On July 21, 1967, presumably following the initial informal investigatory activities outlined above (there is again nothing in the record regarding the actual investigative steps taken), the JFTC began formal proceedings against MEI by issuing a Recommendation seeking to require the elimination of MEI's alleged resale price maintenance activities (DSS 25–A). The text of the factual recitation and application of the law which accompanied the Commission's Recommendation is set out in the margin.[53] Unlike the Market Stabilization Council, on August 3, 1967, MEI rejected the Recommendation, outlining its reasoning in an accompanying letter (DSS 25–B & C).

Therefore, on August 14, 1967, the JFTC notified MEI that a hearing date had been set and issued a Complaint, labelled "Opening Statement of the Hearing." (DSS 25–D & E).[54] This Complaint was identical to the previously issued Recommendation.[55] MEI denied the primary allegations, setting forth its position in a brief–like "Surrogate's Preparatory Document" (DSS 25–F) dated November 22, 1967, after the commencement of the hearings.

Between September 8, 1967 and May 8, 1969, 28 hearings were held, during which 48 witnesses either testified, submitted statements, or both, and 214 exhibits were introduced. At the, conclusion of the hearings, the hearing examiner prepared, pursuant to the procedures outlined *supra*, his initial, or draft, decision (DSS 25–G), recommending a finding that MEI had violated the Anti–Monopoly Law. MEI objected to the Draft, DSS 25–H & I, but ultimately, before the Commission itself acted on the Draft, agreed to entry of a Consent Decision on March 13, 1967 (DSS 25–J). In

53. Matsushita Electric Industrial Co., Ltd. (hereinafter referred to as "Matsushita Electric") is located at the address listed on this document as the Main Office, and is engaged in manufacturing of home electrical appliances. It ranks first in the business industry in domestic sales of TVs, radios, vacuum cleaners, refrigerators, fans, and heating appliances, as of 1966. Matsushita Electric sells most of its domestic electrical appliances (hereinafter referred to as 'National products') to the wholesalers (hereinafter referred to as 'Agency') who deal mostly in National products.

(1) Matsushita Electric has instructed its agencies in order to maintain the retail price of National products at the time of sale of National products, in or around September, 1964, that agencies were not allowed to sell the National products to retailers who sold home electrical appliances at bargain prices and were not to let their retailers engage in transactions with the above. Matsushita Electric has been doing business with agencies only if they follow this practice.

(2) And also Matsushita Electric has instructed its agencies (excluding special agencies) in order to maintain the agencies' selling price of National products at the time of the sale of National products, in or around February, 1965, that the agencies have to sell to their retailers at the wholesale price which the above company provided and that the rebate to their retailers had to be paid on the basis of the standard provided by the above company, and payment of their own rebate is prohibited with regards to most National products, except seasonal products. Matsushita Electric has been doing business with agencies only if they follow this practice. On the basis of each fact of No. 2, Matsushita Electric has been doing business with agencies under conditions which restrict business transactions between the agencies and their retailers.

54. The document submitted to us as the Complaint, the "Opening Statement of the Hearing" (DSS 25–E) appears to be exactly what it purports to be–-the government's opening statement at the hearing. We suspect that the actual Complaint is the document appended to the Consent Decision discussed *infra*, which is labelled "Written Decision to Open the Hearing." Since these documents are in essence identical, and identical to the Recommendation as well, their nomenclature is of no importance here.

55. We note that the translations provided us differ somewhat in the placement of phrases, and we are of course not qualified to compare the original documents. Nonetheless, it is plain from a study of these documents that they are indeed identical in all pertinent respects.

order to agree to the Consent Decision, it was necessary for MEI to withdraw its statement of objections (DSS 25–K) and submit a proposal for compliance with the Decision (DSS 25–L), and subsequently to report on measures taken pursuant to the Decision (DSS 25–M).

It is noteworthy that, in accordance with the procedures outlined *supra*, the facts recited in the Consent Decision are identical to those in the Complaint; in fact, the Commission, in entering the judgment, merely appended the Complaint in support of the Consent Decision.

### C. The Evidentiary Contentions

#### 1. Introduction

Plaintiffs seek to introduce all of the aforementioned JFTC documents as public records and reports under F.R.E. 803(8)(C); in addition, they contend that the documents constitute admissions of a party, rendering them admissible under Rule 801(d)(2) as well.

Defendants contend that the documents in both cases are analogous to unlitigated consent decrees, and are therefore inadmissible under Rule 408, which excludes evidence adduced in settlement negotiations, or alternatively under Rule 410, which excludes withdrawn guilty pleas, pleas of nolo contendere, and offers to plead guilty or nolo contendere, as well as statements made in plea negotiations. Similarly, defendants argue that the documents are inadmissible under the proviso to § 5(a) of the Clayton Act, 15 U.S.C. § 16(a). Sec. 5(a) gives prima facie evidentiary effect to a previous antitrust judgment against a given defendant in an action brought by the United States when that judgment is introduced in a subsequent private action, but the proviso specifies that the section does not apply to consent judgments or decrees. *See* n. 67 *infra*.

Even if the documents are not excluded under Rule 408 or 410 or § 5(a) of the Clayton Act, defendants argue that they do not constitute admissions, and further, that they are hearsay and not public records within the meaning of the 803(8)(C) exception to the hearsay rule because they are not "findings." While they do not maintain that the JFTC proceedings were untrustworthy in the same way that they argue the Treasury and Tariff Commission proceedings were flawed, defendants do call our attention to a number of factors which might render the JFTC documents untrustworthy under the criteria we have developed in Part II, *supra*. Thus, although there was some confusion at oral argument as to whether a trustworthiness objection was being pressed, *see* transcript, Pretrial Order No. 260 at 228–29, 245, and 250–51, it is clear that the trustworthiness of the JFTC documents as proof of the truth of the statements therein contained is at issue.

Finally, defendants argue that the documents are totally irrelevant to this case, in that they deal solely with an alleged domestic market conspiracy, and that, even if there were some limited probative value, it would be overwhelmingly outweighed by the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" so as to be excludable under F.R.E. 403.[56]

Consistent with the earlier segments of this opinion, we will first address the hearsay question, and then turn to defendants' contentions regarding Rules 408 and 410 and § 5(a) of the Clayton Act, and finally to the other relevancy objections.

#### 2. The Hearsay Question: Admissibility Under 803(8)(C)

For the reasons which follow, we hold that the documents of the proceedings be-

---

**56.** Defendants also argue that plaintiffs are attempting to utilize this evidence to portray defendants as having a proclivity to conspire–a form of character evidence which defendants maintain would be excludable under F.R.E. 404(b) as constituting "other bad acts." Plain-

tiffs assure us that they do not offer the evidence to prove character, however, so we need not address the 404(b) arguments. *See* transcript of argument, Pretrial Order No. 261 at 25.

fore the Japanese Fair Trade Commission are not admissible under the exception for public records and reports. Just like the documents discussed in Parts III and IV, *supra*, these documents are plainly hearsay, and therefore not admissible unless they fall into one of the hearsay exceptions. Again, the only relevant exception appears to be 803(8)(C); and again, defendants argue that the documents are not findings within the meaning of 803(8)(C), and that they are not trustworthy under the principles governing that section.

### a. *Findings*

 We explained in Part II, *supra*, why the public records and reports that are admissible under 803(8)(C) are limited to "findings," and why other items in the record of an administrative proceeding are not included under that rubric. The only documents before us which are even arguably findings are the Recommendation Decision in the Market Stabilization Council case, DSS 26, and, with respect to the resale price maintenance case against MEI, the Recommendation, DSS 25–A, the Opening Statement of the Hearing, or Complaint, DSS 25–E,[57] the Initial Decision (or Draft of Decision), DSS 26–G; and the Consent Decision, DSS 25–L.[58] We discussed in both Parts II and III the problem of defining a finding for purposes of 803(8)(C) when a document represents a step in a process which is subject to further review, and concluded that generally it was preferable to treat it as a finding subject to review in terms of the trustworthiness criteria which we have developed.

The factual recitation set forth in the Recommendation Decision in the Market Stabilization Council case, DSS–26, was based entirely upon the initial informal investigation of the Commission's staff. The affidavits make plain that the Commission makes no review of the evidence at this stage of the proceedings. No hearings were held. The text of the Recommendation prepared by the investigative staff automatically became the text of the Recommendation Decision, as required by Sec. 48(4) of the Anti–Monopoly Law.[59] Moreover, a number of decisions by the Japanese Supreme Court state that the Recommendation Decision does not conclusively determine the existence of a violation, that a formal finding by the Commission that a violation exists is not a prerequisite for a Recommendation Decision, and that whether or not violations did in fact exist does not affect whether or not the Recommendation Decision is appropriate. *See, e. g., Idemitsu Kosan K.K. v. Kosei Torihiki I'Inkai*, 32 Minshu 515 (April 4, 1978) (Supreme Court of Japan, 3d P.B.).[60] Furthermore, the Japanese Supreme Court decisions make plain that a Recommendation Decision in no way constitutes formal findings of fact by the Commission. At most, the document represents factual findings of the staff, and not of the Commission.[61]

---

**57.** *See* note 54, *supra.*

**58.** The remaining documents in DSS 25, *see* p. 1177, *supra*, because they cannot be construed as findings and therefore cannot come in as public records under the 803(8)(A) exception to the hearsay rule, are plainly inadmissible hearsay.

**59.** There was some dispute as to whether this section is permissive or mandatory. We accept the position set forth in Dr. Ariga's June 15, 1980 affidavit, in which she states that not only is the statute mandatory, but in her experience Recommendation Decisions are always identical to the Recommendation.

**60.** Translations of seven Japanese cases were provided us by the parties. The Japanese cases do not say, as defendants maintain they do,

that Recommendation Decisions have no evidentiary weight whatsoever. They merely state they are not conclusive. Whether a Recommendation Decision would be admissible in a subsequent Japanese proceeding is irrelevant, for we are concerned here only with admissibility under U.S. law. The Japanese cases are helpful, however, to an understanding of the weight accorded such decrees, as well as to a general understanding of JFTC procedures.

**61.** Plaintiffs rely heavily upon the contention that § 48 of the Anti–Monopoly Act and § 20 of the Regulations, both of which apply to Recommendations, use the words "find" or "finding." While it is true that the translation of the Japanese word at issue, "mitomeru," is to "recognize" or "acknowledge," both of these renditions connote something quite different from

As we have observed in Part II, however, we agree with plaintiffs that 803(8)(C) findings need not be limited to those of the formal body, but that staff findings, "resulting from an investigation made pursuant to authority granted by law," may also be included. *Cf. United States v. Corr*, 543 F.2d 1042, 1051 (2nd Cir. 1976). Therefore, consistent with the approach outlined in Part II, we will examine the "findings" according to the trustworthiness criteria we have developed *supra*.

b. *Trustworthiness*

 With respect to the Advisory Committee's four criteria, we have no reason to question the timeliness of the investigation or the skill and experience of the staff members involved. However, as to the third criterion, no hearing was held. Moreover, serious questions of motivation, the fourth criterion, arise from the fact that the factual "findings" of the Recommendation, which are copied verbatim without review into the Recommendation Decision, are the precursor to the charging document which initiates the prosecution, much as the facts gathered in a grand jury investigation are those resulting in an indictment. The factual findings in both cases are then memorialized in documents whose purpose is not to "find" facts but to accuse. Additionally, the administrative or judicial process which these documents initiate is predicated upon the notion that these accusatory findings are preliminary and likely to be revised in the *de novo* proceedings to follow. In this latter regard, we note that: (1) the "findings" are made at the earliest possible stage of the proceedings, at which the respondent has enjoyed few procedural rights; (2) the "findings" are based upon an informal investigation in which hearsay and ex parte information play a substantial and apparently dominant role; and (3) there is no record of the proceedings.[62]

We find that the preliminary investigation leading up to a Recommendation, *after* which formal proceedings are to commence, is simply too preliminary to be trustworthy within the meaning of 803(8)(C), and that the document relied upon as the distillation of the investigation, because it is accusatory in nature, cannot be deemed a trustworthy finding. The fact that the Commission converts the Recommendation into a Recommendation Decision following acceptance by the respondent does not alter the analysis, for it has been thoroughly documented that the Recommendation Decision does not constitute fact–finding by the Commission. *See* p. 1179, *supra*.

If the Recommendation Decision in the Market Stabilization Council case is not trustworthy enough to be admissible, then neither is the Recommendation in the MEI case. The Complaint in the MEI case is identical to the Recommendation, was in fact copied directly from the Recommendation without additional review, and therefore suffers from exactly the same weaknesses. While based upon staff findings, it is nonetheless an accusatory document, and given its etiology, is still too preliminary in nature to be 803(8)(C) material.

The Consent Decision is also identical to the Complaint. As is discussed in detail in connection with our analysis under Rule 410, *infra*, the Consent Decision does not take into account any evidence adduced during the hearings. Rather, the respondent must consent to entry of a decision

"find." Furthermore, as we have noted previously, even if "find" were the only possible translation, such language would not have talismanic significance in those proceedings.

**62.** Plaintiffs make much of the formal procedural mechanisms set forth in the Anti–Monopoly Law and its Regulations, asserting that the procedural regularity and thoroughness of the investigation render it trustworthy. However, as suggested in note 50, *supra*, Professor Haley had no knowledge as to what investigators actually did; his testimony made clear that he relied solely on the statute as written and that his testimony as to actual operations was entirely speculative. In addition, he agreed that the investigatory powers and procedures set forth in the Act are not necessarily exercised in any given case. *See* Pretrial Order No. 264 at 47 48. Moreover, the procedural regularity of the proceedings has no bearing on our holding that the investigation is too preliminary to be trustworthy.

based solely upon the allegations of the Complaint, as required by Sec. 53(3) of the Anti–Monopoly Law; negotiation is not permitted. *See* p. 1176, *supra.* Thus, the fact that the decision was entered after hearings were held is irrelevant to the analysis, for the "facts found" are identical to and are rooted in the preliminary facts set forth in the Complaint. Therefore, the Consent Decision too is inadmissible.

The Draft of Decision is the only document which includes facts found after hearings, based upon evidence adduced at the hearing. We need not extend this very long opinion by explaining its status within the meaning of 803(8)(C), given its ultimate reviewability by the Commission itself, for the Draft Decision was superseded in this case by the Consent Decision. Consistent with the conclusions set forth in Part II, we do not believe that Rule 803(8)(C) contemplates receipt in evidence of what is essentially a staff report which has no legal effect because of the subsequent entry of the Consent Decision.

Thus, we find that defendants have met their burden of showing that the documents offered in DSS #s 25 and 26 are untrustworthy. Accordingly the documents do not meet the requirements of Rule 803(8)(C) and constitute inadmissible hearsay.

3. *F.R.E. 408, 410, and § 5(a) of the Clayton Act*

F.R.E. 408 excludes from evidence matters pertaining to settlement negotiations and agreements;[63] F.R.E. 410 excludes from evidence withdrawn pleas of guilty, pleas of nolo contendere, and offers to plead guilty or nolo contendere, as well as statements made during plea negotiations.[64] Defendants maintain that both the Recommendation Decision entered into in the Market Stabilization case and the Consent Decision in the case against MEI are consent agreements which are analogous to nolo contendere pleas, and are therefore inadmissible under Rule 410. We agree.

■ It is well–established that unlitigated consent decrees are equivalent to pleas of nolo contendere. *See, e. g., Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2nd Cir. 1976); *City of Burbank v. General Electric Co.*, 329 F.2d 825, 833–34 (9th Cir. 1964); *Simco Sales Service Inc. v. Air Reduction Co.*, 213 F.Supp. 505 (E.D.Pa.1963).[65] Because such consent de-

---

**63.** Rule 408 reads:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The argument under Rule 408 has not been pressed by defendants, nor has it been briefed. Because Rules 408 and 410 are based on similar policies, namely, encouraging expeditious settlement of disputed cases, and because the case at bar fits more neatly into Rule 410, we will address it primarily in the Rule 410 context.

**64.** F.R.E. 410 provides in full:

Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

**65.** The Second Circuit explained, for example that:

nolo pleas have been equated with "consent decrees" for purposes of the proviso to § 5(a) of the Clayton Act. ... The reason for this equivalence is that both consent decrees and pleas of nolo contendere are not true adjudications of the underlying issues; a prior judgment can only be introduced in a later

crees are not decisions on the merits, they are not admissible to prove that any violation occurred. *See Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303 (7th Cir. 1976). Therefore, if the Japanese decisions at issue are analogous to an American consent decree, they are clearly inadmissible.

▮ In the Market Stabilization Council case, the Council accepted the original JFTC Recommendation. As discussed above, that Recommendation was not based on formal fact finding by the Commission, but was in the nature of a preliminary accusatorial document. No hearings were held. The text of the Recommendation automatically became the text of the Recommendation Decision, as required by Sec. 48(4) of the Anti–Monopoly Law. The policy of Sec. 48 is to promote compliance with the Anti–Monopoly Law by encouraging respondents to consent expeditiously to a Recommendation, thereby achieving the elimination of certain practices without the expense of litigating their legality. That is the identical policy underlying both Rules 408 and 410.

Our conclusion that the Recommendation Decision is analogous to a consent decree, hence a *nolo* plea and inadmissible under Rule 410, is reinforced by the decisions of the Japanese Supreme Court discussed at p. 1179, *supra*, all of which state that the Recommendation Decision does not conclusively determine the existence of a violation and that whether or not violations did in fact exist does not affect whether or not the Recommendation Decision is appropriate.

▮ The Consent Decision in the resale price maintenance case against MEI presents a more difficult problem, but we nevertheless reach the same conclusion. The Consent Decision was entered at a later stage of the proceedings, after hearings, and after preparation of a draft of decision, or initial decision, by the hearing examiner, but before final action by the Commission. Furthermore, Sec. 53(3) of the Anti–Monopoly Law, quoted at p. 1180, *supra*, requires that a respondent submit "a written statement setting forth that he admits the findings of fact and the application of law." Thus plaintiffs contend the Consent Decree is more in the nature of a guilty plea, which might well be admissible as an admission under Rules 801(d)(2) and 804(b)(3). *See* 2 *Weinstein on Evidence*, ¶ 410[05], at 410–31.

However, as we explained *supra*, a respondent who decides to enter into a Consent Decision is no more able to negotiate with the Commission than if he were agreeing to a Recommendation Decision. It has been persuasively demonstrated in the affidavits of Drs. Matsushita and Ariga that a Consent Decision merely repeats verbatim the allegations of the Complaint and bears no relationship whatever to evidence adduced during the hearings. The admission is for the purpose of terminating the proceedings and does not necessarily imply that the respondent verifies that the facts alleged in the Complaint are indeed true. Rather, if a respondent wishes for any reason whatever to terminate the proceedings once they have begun,[66] his only route is to request entry of a Consent Decision by way of the legal fiction of admitting the facts as they are set forth in the Complaint. The Commission does not make a detailed analysis of the information gathered by the investigative staff; rather, the Consent Decision is prepared in a rote, mechanical manner, copied from the Complaint. There is thus no adjudication of the facts at issue.

What we have here is a sort of hybrid unknown in American law–not exactly a *nolo* plea; not exactly a guilty plea, for this

---

trial for collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior trial. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2nd Cir. 1976) (citations and footnote omitted).

**66.** Possible motivations for submitting to a consent decision are easily imaginable. In this case, MEI maintains that it was being economically harmed by a consumer boycott which was instigated because of publicity over the JFTC action against it, and that it quite plausibly consented to entry of the Consent Decree in order to deflect public attention and thwart the boycott.

is a civil action; and not exactly a settlement agreement as contemplated by Rule 408, for there can be no compromise or negotiation. Plaintiffs suggest, then, that this hybrid "falls between the cracks" of the exclusionary Rules, and therefore is admissible as an admission under 801(d)(2). While this argument has appeal, we must ultimately disagree. Against the background of Japanese law, we find instead that this document is akin to an American consent agreement, and, therefore, inadmissible under Rule 410 on the same basis as is the Recommendation Decision.

■■■■■ The policies which underlie Rules 408 and 410, as well as Section 5(a) of the Clayton Act,[67] are clear and support the result we have reached. First, these policies encourage expeditious settlement of disputed claims. But more important, once that initial policy is articulated, the fundamental nature of the consent agreement process makes the agreement untrust-

worthy as an indicator of the truth. *See* Advisory Committee Notes to Rules 408 and 410. This final factor is influential and persuades us that the Consent Decision here should not be admitted, for it is plain from the affidavits we have considered that, despite the language of the Japanese statute, a respondent does not, by "admitting" the fact and thereby agreeing to entry of a Consent Decision, verify that the facts are indeed true. While the Japanese Supreme Court has apparently not addressed the meaning of such an "admission," for the cases with which we have been provided deal only with Recommendation Decisions, the Commission, as explained by Professor Ariga, does not view the underlying facts as proved. Moreover, Professor Haley conceded that a Consent Decision should be accorded the same weight as a Recommendation Decision. Pretrial Order No. 264 at 98. Thus, unlike the situation where there has been a guilty plea, there has been no adjudication on the merits.[68] In sum, we find

---

**67.** *Section 5(a) of the Clayton Act, 15 U.S.C. § 16, reads:*

A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title.

Plaintiffs suggest that because this section was enacted to aid the private plaintiff by freeing him from the requirement of relitigating an already litigated violation, the section cannot be applied to exclude evidence. The section has, however, been consistently construed to exclude evidence of both consent decrees and pleas of nolo contendere. *See, e. g., City of Burbank v. General Electric Corp.,* 329 F.2d 825 (9th Cir. 1964); *Commonwealth Edison v. Allis–Chalmers Mfg. Co.,* 323 F.2d 412, 415 (7th Cir. 1963), *cert. denied,* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964); *Dalweld Co. v. Westinghouse Elec. Corp.,* 252 F.Supp. 939, 941 (S.D.N.Y.1966); *Simco Sales Service, Inc. v. Air Reduction Co.,* 213 F.Supp. 505 (E.D.Pa.

1963). *Cf., Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 168 n. 12 (3rd Cir. 1973).

In essence, the proviso to section 5(a) makes it clear that section 5(a) is not to be read to change the common law principle that consent agreements are inadmissible. Thus, in the antitrust context, it presages Rule 410, which, since pleas of nolo contendere have been equated with consent agreements, essentially duplicates 5(a) for all federal actions.

We need not discuss 5(a) in detail, for it applies only to previous actions brought by the United States under American law. Nonetheless, its underlying policies–the same as those underlying Rules 408 and 410, *see supra,*–are relevant to this action. We therefore need not discuss whether the proviso is inapplicable to the MEI case because of its restriction to "decrees entered before any testimony has been taken." In addition, we note only that the MEI Consent Decision, entered after testimony was taken, is distinguishable from the normal situation under U.S. law, in that the Consent Decision does not in any way take into consideration evidence adduced at the hearings.

**68.** We have addressed in this section only the actual decisions tendered by plaintiffs. The additional documents submitted under DSS 25 relating to the resale price maintenance case cannot fairly be called consent agreements. The Recommendation, the Opening Statement of the Hearing, and the Initial Decision were all disposed of *supra* on hearsay grounds. Plain-

the Consent Decision to be analogous to an American consent decree, and inadmissible under F.R.E. 410 to prove the fact of the violations recited therein.

#### 4. Other Relevancy Objections

Defendants contend that the JFTC materials are also easily disposed of on conventional (F.R.E. 402) relevancy grounds. That contention, however, embroils us in one of the primary disputed legal issues in this case, i. e., whether a home market price fixing conspiracy in Japan, if it existed, is relevant to the existence of an export conspiracy. Plaintiffs have posited a single, unitary, long–lasting conspiracy which they urge may not be fragmented for analytic purposes; defendants counter that nothing they may have done in Japan has any bearing whatever on activities in the U.S. market, and that in any event there is no evidence of any violation subsequent to the 1957 Market Stabilization Council case, or in the case of MEI, subsequent to the 1967 case. We do not see this as a question of the law of evidence, but of the substantive law of antitrust conspiracy. Accordingly, we will address this question when we take up the defendants' motion for summary judgment addressed to the conspiracy claims.[69]

Without determining the probative weight to be given the JFTC materials, we are equally unable to strike the balance required to make a determination under the last ground of defendants' objection to the JFTC proceedings, Rule 403. We note, however, that the possibility of unfair prejudice from use of these materials is enormous. The same factors which led to our determination that the decisions at issue are in actuality consent agreements and untrustworthy as evidence of the fact of any actual violation suggests that a jury could be easily misled. Furthermore, we note that if the evidence were to be admitted, defendants would inevitably bring in considerable testimony and exhibits to explain, or in essence relitigate, the issues in dispute before the JFTC. We express no view at this time, however, as to the ultimate weight to be accorded these factors.

#### VI. Admissibility of Judge Higginbotham's Findings of Fact

On January 2, 1975, eight defendants in the Zenith case and three defendants in the NUE case filed identical motions to dismiss based upon (1) lack of personal jurisdiction; (2) improper venue; and (3) insufficient service of process.[70] The issues raised by defendants' motions were briefed extensively by the parties, and an extensive record was compiled. In addition, the moving defendants responded to interrogatories propounded by the court for the purpose of eliciting additional facts relevant to the matters placed in issue by those defendants. Following four days of oral argument, Judge Higginbotham, see n. 6 supra, filed an opinion in which he concluded that "this Court may exercise jurisdiction over each of the moving defendants, that venue is proper for each of them in this district, and that each of them has been adequately served with process." Zenith Radio Corporation v. Matsushita Electric Industrial Co., 402 F.Supp. 262, 267 (E.D.Pa.1975). In reaching his decision, Judge Higginbotham made extensive findings of fact based upon:

(1) defendants' answers to the Court's interrogatories in the Zenith and NUE ac-

---

tiffs argue that those of the documents in DSS 25, see pp. 1177–1178, supra, which originated with Matsushita are admissions and therefore admissible independently under 801(d)(2). We disagree, for we view these documents as essential steps to the Consent Decision, so inextricably intertwined as to be logically inseparable.

**69.** Moreover, if the evidence were to be deemed relevant, it would be necessary to decide which parties it would be admissible against. This too is a matter for consideration in conjunction with the conspiracy motion.

**70.** In the Zenith case, the moving parties were Matsushita Electric Industrial Co., Ltd. (MEI), Matsushita Electronics Corporation (MEC), Matsushita Electric Trading Co., Ltd. (MET), Sharp Corporation (SHARP), Hitachi, Ltd. (HITACHI), Mitsubishi Electric Corporation (MELCO), and Sanyo Electric Co., Ltd. (DENKI). KADEN, MELCO and DENKI were the movants in the NUE case.

tions; (2) those of plaintiff's proposed findings of fact in the NUE action that are reasonably supported by the evidence; and (3) other factual submissions of the plaintiffs that are relevant to the issues raised by the moving defendants.

*Id.* at 268 (footnote omitted).

Plaintiffs contend that Judge Higginbotham's findings represent the "law of the case" and that defendants are thus precluded from relitigating these findings in connection with the summary judgment motions or at trial; they argue further that the findings are admissible now and at trial for all purposes under F.R.E. 803(8)(C). We shall not dwell upon the "law of the case" point, for it is clear beyond cavil that Judge Higginbotham's findings, which were addressed to the preliminary motion to dismiss, are not "the law of the case" as to any legal issues beyond personal jurisdiction and venue [71] and do not control the issues now before us and upcoming in connection with the motions for summary judgment. We shall, however, address, albeit briefly, plaintiffs' contentions that Judge Higginbotham's findings are somehow admissible as a public record or report. This contention is plainly incorrect for the following reasons.

First, a reading of the text of § 803(8)(C) makes it plain that the drafters were not talking about judicial findings; rather, the rule speaks of factual findings resulting from "an investigation made pursuant to authority granted by law." Surely, Judge Higginbotham was not engaged in that pursuit. Second, a review of the advisory committee note makes it clear that judicial

findings are not encompassed; not only is there not the remotest reference to judicial findings, but there is a specific focus on the findings of officials and agencies within the executive branch.

Our conclusion, however, does not rest solely upon the text of § 803(8)(C) and its legislative history. Additionally, we find that the construction opted for by plaintiffs would create a conflict with other sections of the F.R.E. Accordingly, a third basis for our rejection of plaintiffs' position is that the trustworthiness evaluation which we have discussed at length *supra* would be totally unsuited to evaluating judicial findings. Indeed, such evaluation might well conflict with Rule 605, which makes the judge incompetent as a witness. This result follows because the process of determining trustworthiness, either *in limine* or by way of defense at trial (if a preliminary determination of trustworthiness were made), cognizes the possibility of calling the author of the fact–finding, or his staff members, as witnesses so as to impeach their work. That just cannot be done under the F.R.E. with respect to a judge.

Another conflict, and the fourth reason for our rejection of plaintiffs' argument is that where the drafters wished to make judicially found facts admissible, they did so expressly. *See* Rule 803(22) pertaining to judgments of previous conviction and Rule 803(23) pertaining to judgments as to personal, family, or general history, or boundaries.[72] The drafters did not so provide with respect to other judicial findings or judgments. Finally, even if Judge Hig-

---

**71.** The "law of the case" doctrine operates to call a halt to attempted relitigation of issues once they have been decided. *See, e. g., White v. Murtha,* 377 F.2d 428 (5th Cir. 1967); *Swietlowich v. County of Bucks,* 610 F.2d 1157 (3rd Cir. 1979). The authorities are clear that it is legal issues which cannot be readdressed; preliminary factual findings made for one purpose are plainly not the law of the case with respect to issues of substantive liability.

**72.** F.R.E. 803(22) excepts from the hearsay rule:

Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person

guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment, but not including, when offered by the Government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused. The pendency of an appeal may be shown but does not affect admissibility.

Similarly, 803(23) excepts:

Judgments as proof of matters of personal, family or general history, or boundaries, essential to the judgment, if the same would be provable by evidence of reputation.

ginbotham's findings were otherwise admissible, they would have to be excluded under Rule 403. This is because such findings would present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice. There would also be a prospect of confusing the issues and causing undue delay because of the time necessary to explain to the jury that the findings were made only as they relate to the preliminary matters of personal jurisdiction, venue, and service of process, all of which, of course, implicate different legal issues than are involved at trial. This would in turn require a veritable exegesis of abstruse areas of the law.

## VII. Materials from the Organization for Economic Cooperation and Development and the United Nations

### A. Introduction

The last two documents with whose admissibility we are here concerned are contained in DSS #s 46 and 47. DSS #s 46 consists of an excerpt from a report of the Organization for Economic Cooperation and Development (OECD) prepared in 1968 and entitled "Electronic Components–Gaps in Technology." The excerpt sought to be introduced is a part of a section of the report captioned "The Main Inventions and New Technologies in the Industry" and includes a discussion and data indicating that most technological advances in the post World War II semiconductor industry were made by American firms. DSS # 47 is a table taken from a publication of the Statistical Office of the United Nations entitled *The Growth of World Industry, 1967 Edition, Volume II, Commodity Production Data,* 1953–1966 (1968). The table sets forth television production figures of member countries for the years 1953–1966.

Admission is sought primarily under 803(8)(A) and/or (B), although presumably

at least the narrative portions of the OECD report are the sort of material covered by 803(8)(C). Although the parties have agreed (for 803(8) purposes) on the admissibility of many statistical documents, defendants have objected to DSS #s 46 and 47 primarily on the ground that they are not the product of "public offices or agencies" within the meaning of 803(8). They also raise trustworthiness objections.

The organization for Economic Cooperation and Development is an international organization made up of nation states.[73] It was established by convention and protocols signed in Paris in December, 1960. The convention was ratified by President Kennedy in March, 1961, with the advice and consent of the United States Senate. It was entered into force in September, 1961, and proclaimed by the President in November, 1961. Its purpose is to "promote the highest sustainable growth [of the economies of member countries] and improve the economic and social well–being of their peoples," through economic cooperation. 12 U.S.T. 1728, 1731, T.I.A.S. 4801. To this end, the organization may make decisions that are binding on all its members, make recommendations to its members, and enter into agreements with members, non–member states, and international organizations. 12 U.S.T. at 1734.

The report at issue here was presented for information at the Third Ministerial Meeting on Science of OECD countries, held in March, 1968. It was prepared by a group of experts nominated by the countries that wished to participate in the work of the sector concerned and by experts from universities and industry.

A questionnaire was prepared and sent to each of the participating countries, and the experts collected and coordinated national replies. The data submitted by member countries were supplemented by visits to firms, discussions with experts, and analysis

---

**73.** At present member countries are Australia, Austria, Belgium, Canada, Denmark, Finland, France, The Federal Republic of Germany, Greece, Iceland, Ireland, Italy, Japan, Luxembourg, The Netherlands, New Zealand, Norway, Portugal, Spain, Sweden, Switzerland, Turkey, The United Kingdom, and the United States. Yugoslavia participates with special status.

of available statistical data by the OECD Secretariat. On the basis of this information, the Secretariat prepared a first draft of a report, which was discussed and ultimately agreed to by the experts.

The Statistical Office of the United Nations is a part of the U.N.'s Department of International Economic and Social Affairs and is granted authority to compile statistical data by the Statistical Commission of the U.N.'s Economic and Social Council. The Statistical Office compiled the data set forth in *The Growth of World Industry, Volume II,* pursuant to Resolution 7–XV, ¶ 2 (1968) of the Statistical Commission, which provides for the compilation and publication of international comparable industrial data, including industrial commodity production statistics on a selected basis.

**B. *Are the OECD and the United Nations Public Offices or Agencies Under 803(8)***

■ Prior to the enactment of the F.R.E., admission of official records in federal litigation was governed by 28 U.S.C. § 1733(a), which provided:

> Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept.

Records of nonfederal agencies (including those of state and foreign governments) were not admissible under this section. Rule 803(8) is thus broader in scope since, as the Advisory Committee noted, it "makes no distinction between federal and nonfederal offices and agencies."

■ As we observed *supra* n.11, it is clear that 803(8) permits admission of records that are the products of foreign governmental agencies. Whether the rule also permits introduction of reports of supragovernmental agencies is a different question, however, and is apparently one of first impression.

Citing *Reparation for Injuries Suffered in Service of the United Nations* (1949) I.C.J. 174, 178–79, plaintiffs have argued that under international law both the U.N.

and the OECD are legal personalities and thus may be deemed public offices or agencies. They note that the United Nations Charter and the Convention and Protocols for the OECD have been accepted by the governments of both Japan and the United States. For their part, defendants interpret the phrase "public offices or agencies" as meaning offices or agencies of a "duly constituted governmental body." While nothing in the Advisory Committee Note to 803(8) can fairly be said to address this issue, we see nothing in the language of 803(8) and no hint in the Advisory Committee Note to indicate that the phrase "public offices or agencies" is thus delimited or that a "duly constituted governmental body" cannot include an international governmental body such as the United Nations or a supranational agency such as the OECD. Rather, given the background of their creation, the breadth and regularity of their public business, and the solemnity of their duties, we see treatment of the U.N. and OECD as public offices or agencies as consistent with the theory and raison d'etre of 803(8)—the notion that circumstantial guarantees of trustworthiness are provided by the presumption that governmental reports are reliable or probably reliable. *See* Saltzburg and Redden, *Federal Rules of Evidence Manual,* (2d Ed. 1977) at 32.

In sum, in the absence of authority to the contrary, we are satisfied that both the United Nations and the OECD qualify as public offices or agencies within the meaning of 803(8). Since there has been no question raised as to whether these materials set forth "the activities of the office or agency," 803(8)(A), "matters observed pursuant to duty imposed by law as to which matters there was a duty to report," 803(8)(B) or "factual findings resulting from an investigation . . ." 803(8)(C), we turn to the trustworthiness objection raised by defendants.

**C. *Trustworthiness***

■ As we indicated *supra* at 1145, 803(8) presumes admissibility of public records and reports in the first instance, and

the burden is on the party opposing admission to rebut the presumption of trustworthiness. As to the report of the OECD, defendants argue that there is insufficient evidence of the source of the data. In response, plaintiffs note that the data was compiled by a panel of experts who, while not identified in these materials, represented a number of countries and who discussed and agreed to the final report. There is no reason to suspect, and defendants have not presumed to suggest, any motivational problems on the part of these experts.

As to the data compilation prepared by the Statistical Office of the United Nations, defendants object that the report does not indicate that "the source of the data was ever confirmed." While we are not altogether sure what is meant by this statement, we believe that as it stands it is insufficient to impugn the sources of the information and thus the presumed trustworthiness of the document.

Relatively little time was devoted to these documents, at least in comparison to the matters discussed earlier in this opinion, and defendants did not martial much in the way of objection. While we cannot be sure what would emerge from more searching scrutiny, we conclude that as to these two documents, defendants have failed to show that "the sources of information or other circumstances indicate lack of trustworthiness." Thus, DSS #s 46 and 47 are admissible as 803(8) exceptions to the rule against hearsay.

## VIII. Conclusion

This opinion has analyzed in great detail, through a series of evidentiary layers, the documents contained in DSS #s 1–26, as well as Judge Higginbotham's 1975 findings and certain miscellaneous documents containing statistical data. For the reasons set forth, we find admissible only the documents described in Part VII, *supra*, and will exclude the others from consideration in connection with the motions for summary judgment on plaintiffs' conspiracy and other affirmative claims, and in connection with our preliminary (Rule 104) determination as to whether plaintiffs have come forward with sufficient independent evidence of the existence of the conspiracy they have charged among the defendants to go forward with those conspiracy claims.

Had this been an ordinary case, it would have been unnecessary for us to have approached the problems presented through so many evidentiary layers. It would have been enough, for example, to exclude the evidence had we found it to be hearsay and not subject to the 803(8)(C) exception, without considering the other grounds of objection. We have addressed all potential evidentiary questions for two reasons. First, given the magnitude of the case and its history to date, there is a certainty of appellate review, and we think it important to "touch all bases" and analyze the issues from every relevant direction for the ultimate benefit of the parties and the Court of Appeals and so that there can be no remand because of a failure to address particular questions. Second, and of more immediate application, it is necessary that all evidentiary objections be decided because of the impact on the case of F.R.E. 703.

As will appear in bold relief when we write about the admissibility of plaintiffs' opinion evidence, a subject we will address in the third opinion in this evidentiary series, (the second opinion will deal with all the items listed at 1137–1139, *supra*, and not considered herein), Rule 703 provides that the facts or data upon which an expert bases an opinion or inference need not be admissible in evidence so long as they are of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." We dwelt extensively upon the expert opinions during the course of our evidentiary hearings and have read the expert reports and can thus state that many of the matters we have excluded and many matters which will be excluded in our next opinion are relied upon heavily in the reports of plaintiffs' experts. Plaintiffs announced during the hearings that they believe that the experts may properly rely on the excluded material, cit-

ing Rule 703. Thus the *basis* on which the evidence was excluded becomes extremely important. For instance, if a document was excluded for some technical reason, perhaps the expert may still rely upon it if Rule 703 is otherwise met. If, however, it was excluded because it was untrustworthy, perhaps he may not. As we have ofttimes observed during the course of these hearings, where the point was demonstrated again and again, the F.R.E. are a veritable "seamless web."

Because our rulings are all subsumed within the foregoing opinion, a separate Pretrial Order is unnecessary; this opinion will constitute P.T.O. No. 283.

## APPENDIX
### DOCUMENTARY SUBMISSION SHEET [1]

Date: _____

### I. DOCUMENT IDENTIFICATION

A. **PARTY OFFERING EVIDENCE:** _____

_____

B. **DOCUMENT IDENTIFICATION**:
 1. Document Number: _____
 2. Brief Description: _____

 _____
 3. FPS Reference(s) [2]: _____
 4. Description of Documents of a Similar Type [3]: _____

_____

_____

_____

C. **PARTY(S) AGAINST WHOM OFFERED:** _____

_____

_____

------------------------------------------------------------------

### II. OBJECTOR POSITION

Date: _____

Identify Objector: _____

☐ No Objection.

Objections: Reasons.

☐ Lacks Authenticity (F.R.E. 901): _____

☐ Not Business Record (F.R.E. 803(6)): _____

☐ Not Public Record or Report (F.R.E. 803(8)): _____

☐ Other Hearsay (F.R.E. 802): _____

☐ Lacks Trustworthiness: _____

☐ Irrelevant (F.R.E. 402): _____

☐ Other: _____

_____

1. See Documentary Submission Instructions.
2. Multiple references to be listed on separate attached sheet.
3. Documents of a similar type, such as invoices, purchase orders, etc., may be submitted with a single DSS.

1190

### III. PROPONENTS' REPLY

Date: _____

Rejoinder: Reason.

☐ Authentic (F.R.E. 901): _____

☐ Authentic (F.R.E. 902): _____

☐ Admission (F.R.E. 801(d)(2)): _____

☐ Business Record Exception (F.R.E. 803(6)): _____

☐ Public Record or Report Exception (F.R.E. 803(8)): _____

☐ Other Hearsay Exception: _____